**UNITED COAL COMPANIES, Appellant,**

v.

**POWELL CONSTRUCTION COMPANY and Interstate Equipment Corporation and Bethlehem Steel Corporation, Appellees.**

No. 87–3431.

United States Court of Appeals, Third Circuit.

Argued Dec. 16, 1987.

Decided Feb. 17, 1988.

David A. Scotti (argued), C.S. Fossee, Reale, Fossee & Ferry, P.C., Pittsburgh, Pa., for Interstate Equipment Corp.

G. Daniel Carney (argued), Deborah P. Powell, Thorp, Reed & Armstrong, Pittsburgh, Pa., for Bethlehem Steel Corp.

Robert R. Reeder (argued), Susan M. Danielski, Judith A. Mackarey, Cozen and O'Connor, Philadelphia, Pa., James R. Hankle, Doherty and Robb, P.C., Pittsburgh, Pa., for United Coal Companies.

Daniel J. Ryan, Labrum and Doak, Philadelphia, Pa., for amicus curiae The Defense Research Institute, Inc.

Before GIBBONS, Chief Judge, SLOVITER and COWEN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Chief Judge:

United Coal Companies (United) appeals from a final judgment dismissing its diversity products liability complaint against Interstate Equipment Corp. (Interstate) and Bethlehem Steel Corp. (Bethlehem) with prejudice for failure to comply with court orders respecting discovery. United contends that the court erred in ordering discovery of materials to which the attorney client or work product privileges applied. United also contends that the court erred in an earlier ruling that requests for admissions served by Interstate and Bethlehem would be deemed admitted. We conclude that the case should not have been dismissed and that the ruling with respect to requests for admissions was error. Thus we will reverse.

### I.

#### Proceedings in the District Court

United owns a coal mine and processing plant at Big Rock, Virginia. At that site it operated an aerial tramway to move coal refuse from one of its processing facilities. On July 23, 1984 a haul rope supplied by Bethlehem and installed by Interstate broke, permitting sixty-two cars on the aerial tramway to fall to the ground. United was insured for casualty losses by Royal Insurance Company and St. Paul Fire & Marine Insurance Company. These casualty insurers paid a loss claim totalling $1.5

million, obtaining a subrogation of United's rights against third parties liable for the loss. The subrogation receipts authorized the insurers to sue in United's name. The insurers retained attorneys to do so, and on July 18, 1986 those attorneys filed a complaint seeking to hold Bethlehem and Interstate liable for the entire loss, including over $166,000 in damages for which United has not been reimbursed.

During the course of pretrial proceedings Bethlehem and Interstate filed a motion to dismiss or add Royal Insurance Company and St. Paul Fire & Marine Insurance Company as the real parties in interest. No order was ever entered on this motion, because in response to it the insurers executed and served on Bethlehem and Interstate agreements expressly ratifying United's suit and undertaking to be bound thereby. This action was taken pursuant to Fed.R.Civ.P. 17(a), which in relevant part states:

> No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

Thus the effect of service of the Rule 17(a) ratification agreements was as if Royal Insurance Company and St. Paul Fire & Marine Insurance Company had been parties from the beginning of the action.

Extensive discovery had commenced before the real party in interest motion was filed, and continued after the filing of the Rule 17(a) ratification agreements. The district court imposed a discovery deadline of March 27, 1987, which was later extended to April 30, 1987. By then thirty-six depositions had been taken, and United had produced numerous documents, both from its own files and from the files of the insurers. Certain documents which were included in the Bethlehem or Interstate discovery requests were withheld, however,

under claims of attorney client or work product privilege. These were listed in two letters from United's counsel to counsel for Bethlehem and Interstate.

On April 30, 1987 Bethlehem and Interstate filed a motion to compel production of the withheld documents. The motion states in relevant part:

14. Documents have been withheld from production pursuant to a claim of privilege asserted by counsel for plaintiffs.

15. Counsel for defendants are unable to test the validity of plaintiffs assertion of privilege since counsel for defendants have not viewed the documents which have been withheld.

16. Defendant would request that this court or this court's designee, e.g., a federal magistrate, review the documents withheld by plaintiffs to determine whether or not plaintiff's assertion of privilege is well founded.

17. Upon completion of the requested document review, counsel for defendants request that plaintiffs be compelled to produce all documents or portions of documents which are not subject to privilege for inspection by counsel for defendants.

WHEREFORE, defendants, Interstate Equipment Corporation and Bethlehem Steel Corporation respectfully request this Honorable Court to direct plaintiffs to turn over the withheld documents for review by the court and all properly discoverable documentation be turned over for review by defense counsel.

Thus Bethlehem and Interstate did not claim that the attorney client or work product privileges were generally inapplicable, but merely asked the court to examine the documents and rule on the applicability of those privileges to individual documents.

The district court scheduled a hearing on this motion on May 1, 1987. Local counsel for United thus had only one day notice, and did not have any opportunity to file a written response. Counsel for Interstate requested that the documents as to which a claim of privilege was made be produced for examination *in camera.* As he put it:

All we are asking, whatever has been withheld, if Your Honor could review it, or even give it to a federal magistrate to review it so we can be sure.

The court addressed both claims of privilege. With respect to the attorney client privilege this colloquy took place between United's local counsel and the court:

THE COURT: What's the basis of that; what have you maintained is the basis for their not reviewing them?

MR. HANKLE: Most of the basis was attorney-client privilege. They were letters from us to those individuals.

THE COURT: To your clients?

MR. HANKLE: To the insurance companies, to the clients.

THE COURT: Wait a minute. The only protection is communications between you and your client. Letters to insurance companies are not protected.

\* \* \* \* \* \*

THE COURT: That is not privileged. Only communications between the lawyer and his client are privileged.

MR. HANKLE: Even where they are subject to subrogation action, where the insurance companies are subrogating this action?

THE COURT: Are they your clients?

MR. HANKLE: Well, I guess ultimately the United Coal would be the client. We have to protect them as—

THE COURT: Then those are not protected. You have to give them those, those communications.

With respect to the work product privilege this colloquy took place:

MR. CARNEY [Counsel for Bethlehem]: Additionally, Your Honor, there was a classification of documents where counsel said they were privileged because they contained mental impressions pertaining to the litigation, and I don't know of any such privilege.

THE COURT: They were communications to who?

MR. CARNEY: Lay person to lay person, not involving a lawyer, an insurance adjuster to his insurance company.

THE COURT: Those aren't protected.

MR. CARNEY: I don't think so either.

THE COURT: Give him those documents that fit into that category.

MR. HANKLE: I was under the impression that the rules apply for mental impressions of the merits of the litigation.

THE COURT: The lawyers' mental impressions.

MR. HANKLE: But it is only the lawyers' that can be?

THE COURT: Yes.

MR. HANKLE: And not the adjuster's or anyone else?

THE COURT: That is right.

Without examining them, the court directed that all the disputed documents except letters between United and counsel should be turned over to Bethlehem and Interstate.

One additional issue was addressed at the May 1 hearing. Interstate's attorney announced that he intended to submit two additional discovery motions. The court directed "Let's do it right now." This colloquy followed:

MR. SCOTTI: Well, okay. Their answers to my request for admissions; first of all, there are several answers where the only response I got was one word, "denied."

THE COURT: So they are admitted.

MR. SCOTTI: Thank you.

THE COURT: That doesn't meet the requirements.

This ruling was made without prior notice to United, and without looking at the requests for admission, and answers, which read as follows:

10. Lack of adequate lubrication of the pin and bushing on the socket which failed was at least a contributing factor to the accident of July 23, 1984.

RESPONSE: Denied.

11. Lack of adequate lubrication of the pin and bushing on the socket which failed was the cause of the accident on July 23, 1984.

RESPONSE: Denied.

12. On or before July 23, 1984, there is no written agreement regarding the inspections and repair work that was to be performed by Interstate Equipment Corporation other than the purchase orders for the work performed or the inspections conducted.

RESPONSE: Denied.

15. Prior to July 23, 1984, United Coal Companies was aware that all the haul ropes on the aerial tramway system were scheduled to be changed, i.e., replaced during August of 1984.

RESPONSE: Denied.

16. Prior to the incident of July 23, 1984, United Coal Companies never contracted with Interstate to have Interstate review or revise the maintenance documentation of United.

RESPONSE: Denied.

19. Prior to July 23, 1984, it was the responsibility of United to perform all inspections of the aerial tramway system and its component parts in between the quarterly inspections being performed by Interstate Equipment Corporation.

RESPONSE: Denied.

The hearing concluded shortly thereafter with this notation:

THE COURT: The transcript of this conference is the order of the court. Upon request, the reporter will transcribe at the joint cost of the parties.

After the May 1 hearing United promptly advised Interstate that it was preparing a motion for reconsideration of the three discovery rulings. Nevertheless, on May 12 Interstate filed a Fed.R.Civ.P. 37 motion for sanctions. That motion relied on the transcript of the May 1 hearing as an order to produce the documents as to which attorney client and work product privileges were asserted. Although the transcript did not specify a time for production, the motion sought a dismissal of the action for willful failure to comply with the court's order. United moved for reconsideration of all three rulings, and for a stay of the orders requiring production of documents until the motion for reconsideration of those orders was decided. United also prepared and served amended responses to the

requests for admission, which are quoted in the margin.[1]

A hearing on various motions was held on May 15. At the outset of the hearing the following exchange occurred:

MR. FOSSEE (Counsel for Interstate): They were requested, and I was told that they would not be produced, and they would never produce them.

1. The amended answers for requests 10, 11, 12, 15, 16 and 19 were:

10. It is specifically denied that lack of adequate lubrication of the pin and bushing on the socket which failed was a contributing factor to the accident of July 23, 1984. To the contrary, United Coal personnel responsible for maintaining and supervising the maintenance work on the aerial tramway system have testified that the pins and bushings on the sockets were lubricated on a weekly basis, as was recommended by Interstate. In fact, David Pendergrass, third-shift mechanic responsible for the actual lubrication to the pins and bushings, testified that he lubricated the pins and bushings a few days before the accident. Moreover, the reports of Alpha Associates, Inc., state lubrication was not a contributing cause to the failure. Finally, Nicholas Portmann, an engineer who inspected the bushing on the socket which failed subsequent to the accident, testified that he inspected the bushing and found that it had been adequately lubricated prior to the accident.

11. It is specifically denied that lack of adequate lubrication of the pin and bushing on the socket which failed was the cause of the accident of July 23, 1984. To the contrary, United Coal personnel responsible for maintaining and supervising the maintenance work on the aerial tramway system have testified that the pins and bushings on the sockets were lubricated on a weekly basis, as was recommended by Interstate. In fact, David Pendergrass, third-shift mechanic responsible for the actual lubrication to the pins and bushings, testified that he lubricated the pins and bushings a few days before the accident. Moreover, the reports of Alpha Associates, Inc., state lubrication was not a contributing cause to the failure. Finally, Nicholas Portmann, an engineer who inspected the bushing on the socket which failed subsequent to the accident, testified that he inspected the bushing and found that it had been adequately lubricated prior to the accident.

12. It is specifically denied that on or before July 23, 1984, there were no written agreements regarding the inspection and repair work that was to be performed by Interstate Equipment Corporation other than the purchase orders for the work performed and the inspections conducted. To the contrary, plaintiff's Exhibits No. 95 and 46 are the writings which pertain to inspections and repair work to be performed by Interstate Equipment Corporation.

15. It is specifically denied that prior to July 23, 1984, United Coal Company was aware that all the haul ropes on the aerial tramway system were scheduled to be changed, i.e., replaced during August of 1984. To the contrary, Interstate was the entity who determined when the haul ropes should be changed or replaced and testimony of both United Coal and Interstate employees confirms that United Coal always followed such recommendations. Interstate was also responsible for ordering and installing new haul ropes and United Coal was only aware that new haul ropes had been ordered by Interstate, but were not delivered to United Coal prior to the accident on July 23, 1984. After reasonable investigation, and as the deposition testimony confirms, United Coal cannot determine that its employees were aware that the haul ropes were scheduled to be changed in August of 1984.

16. It is specifically denied that prior to the incident of July 23, 1984, United Coal Company never contracted with Interstate to have Interstate review or revise the maintenance documentation of United. To the contrary, Interstate's own maintenance manual, plaintiff's Exhibit No. 46, specifically states that "the Interstate representative should care fully [sic] check and go over the log book [made by United] and discuss it with the personnel in charge of the equipment." Moreover, plaintiff's Exhibit No. 95 is the original proposal pertaining to inspections that Interstate would perform, which was accepted by United Coal. Interstate was to perform all repair work other than routine maintenance and inspection services as described in its maintenance manual.

19. It is specifically denied that prior to July 23, 1984, it was the responsibility to perform all inspections of the aerial tramway systems and its component parts in between the quarterly inspections being performed by Interstate Equipment Corporation. Pursuant to its agreement with Interstate, United Coal was to perform only routine maintenance work. Interstate was to perform all repair work, other than of a minor nature, and was to perform inspections on at least a quarterly basis. United Coal relied upon Interstate's knowledge and expertise with respect to the maintenance, inspection and repair of the aerial tramway system designed and installed by Interstate. Interstate was consulted by United Coal on a regular basis to inspect and/or repair any problems experienced with the tram and Interstate was frequently at United's aerial tram site performing such inspection and/or repair work.

MS. MACKAREY (Counsel for United Coal): Your Honor, what we advised the defendants was that we were in the process of preparing a motion for reconsideration of the court's order. I have a courtesy copy of that for you.

THE COURT: That is not much good here.

MS. MACKAREY: And a request for a stay.

THE COURT: Your motion for reconsideration is denied, and your motion for stay is denied.

MS. MACKAREY: Your Honor, if could, just give us a moment to argue that motion.

THE COURT: You had your moment, and that was on May 1.

MS. MACKAREY: Your Honor, I think the problem is the insurance companies are our clients. You know, if I could just have a moment to address this.

THE COURT: Not according to the caption of the case.

MS. MACKAREY: They may not be named plaintiff. They are our clients. We were retained by them. They have an interest in this action.

THE COURT: If those documents are not in the hands of these defendants by Monday at noon, this case will be dismissed.

MS. MACKAREY: Your Honor, will you give me an opportunity to try to explain?

THE COURT: No, I won't. No, I won't. You had that opportunity on May 1. We will not go into that again. I made my order on May 1. I have received no word from you until now about any reconsideration of it. You knew what you were ordered to do. You have not done it.

MS. MACKAREY: We are within the time in which to file a motion for reconsideration, and we are asking for a stay until the motion is decided.

THE COURT: I am denying it.

Despite the peremptory denials of any reconsideration, the court finally did allow United's counsel some argument. The end result was the same, however, with the court denying the motion and ordering production of the relevant documents by 12:00 noon on Monday, May 18 on pain of dismissal. The court again based its ruling on the fact that the insurance companies were not named parties to the lawsuit.

On the issue of the work product privilege, the following exchange occurred:

MS. MACKAREY: How about the work product privilege which is our privilege?

THE COURT: You have never raised the work product privilege before now. You had a chance at the conference on May 1, and you did not raise that. Now you are thinking of anything else that you can raise.

MS. MACKAREY: I believe it was just talked about.

THE COURT: I heard enough. I am telling you what is going to happen. If these documents are not in the hands of the defendant by 12:00 on Monday, your case will be dismissed. I will not hear anything more.

The court also considered United's motion for reconsideration of the order deeming six requests for admission to be admitted. The requests for admission were couched in terms dispositive of critical factual or legal issues, and United argued that its answers were in compliance with Fed.R. Civ.P. 36. The court flatly rejected that contention. United also urged that it should at least be permitted to amend the disputed answers. The court reserved decision on the amendment issue.

On May 18 United, urging that compliance with the court's order to deliver privileged documents would cause it and the insurers irreparable harm, requested the court to certify the privilege issues for immediate appeal pursuant to 28 U.S.C. § 1292(b), and to stay the order pending such an appeal. Alternatively, United suggested that holding counsel in contempt was a more appropriate sanction than dismissal.[2]

**2.** *See Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947) (civil contempt sanc-

On May 19 the district court dismissed the action with prejudice for failure to comply with its May 1 and May 15 orders for production of documents. The court rejected the contention that alternative sanctions would be effective.

## II.

### Attorney Client Privilege

In this diversity case Fed.R.Evid. 501 refers the district court, on questions of privilege, to state law. The reference, in the first instance, is to the law of the forum state. *Samuelson v. Susen*, 576 F.2d 546, 549 (3d Cir.1978). The parties do not suggest that Pennsylvania law would in this case look to the law of any other state with respect to the attorney client privilege, or that if it did such law would differ from Pennsylvania's. It is undisputed that the correspondence in issue is between attorneys and insurance companies which retained them to prosecute this action. It is undisputed that the action seeks recovery both for the insurance companies, and in a much smaller amount for United. The court ruled that as a matter of law the attorney client privilege was inapplicable. Thus our review of this legal issue is plenary. *See Sporck v. Peil*, 759 F.2d 312, 315, 319 (3d Cir.), *cert. denied*, 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985); *Bogosian v. Gulf Oil Corp.*, 738 F.2d 587, 591 (3d Cir.1984).

■ Since 1887 the attorney client privilege has been codified. Act of May 23, 1887, P.L. 158, § 5(d), 1887 Pa. Laws 159. The present codification provides:

> In a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client.

42 Pa.Cons.Stat.Ann. § 5928 (Purdon 1982). Where, as here, an attorney represents two clients, the privilege applies to those clients as against a common adversary. *See Tracy v. Tracy*, 377 Pa. 420, 424, 105 A.2d 122,

125 (1954). Pennsylvania law in this respect is consistent with the settled law in all American jurisdictions. *See Eisenberg v. Gagnon*, 766 F.2d 770, 787–78 (3d Cir.), *cert. denied*, 474 U.S. 946, 106 S.Ct. 343, 88 L.Ed.2d 290 (1985); G. Weissenberger, Weissenberger's Federal Evidence § 501.5 (1987); J. Wigmore, Wigmore on Evidence § 2312 (McNaughton rev. 1961). Furthermore it is the attorney client status that determines the existence of the privilege, and not party status. The key is whether the person asserting the privilege had a professional consultation with an attorney, who acts or advises as such. *Okum v. Commonwealth, Unemployment Compensation Bd. of Review*, 77 Pa.Commw. 386, 389, 465 A.2d 1324, 1325 (1983). Thus this court has recognized that non-parties may assert applicable privileges. *See In re Grand Jury Proceedings (FMC Corp.*, 604 F.2d 798, 799–801 (3d Cir.1979) (non-subpoenaed privilege holder, under grand jury investigation, could assert privilege); *In re Grand Jury Investigation (Sun Corp.)*, 599 F.2d 1224, 1228 (3d Cir.1979) (subpoenaed subject of grand jury investigation could assert privilege). Thus the district court committed legal error when it ruled that the non-party status of the insurers was dispositive on their claim of attorney client privilege. They were clients, and no more was required to support their assertion of the privilege.

■ Even if the privilege were unavailable to non-parties, however, the court also erred in treating the insurance companies as non-parties in this instance. In response to the Rule 17(a) motion of Interstate and Bethlehem the insurers served ratification agreements. Thus for purposes of this case they were co-plaintiffs with United. As a result, even the ground on which the court erroneously relied is on this record completely insupportable.

■ Since a principal reason relied on for the entry of the order imposing the dismissal sanction was legal error, the dismissal sanction must be reversed and the case remanded to the district court for further

tion for failure to obey order violating work

product privilege reversed on appeal).

consideration of the claim of attorney client privilege. The proper procedure for such consideration is that which the defendants asked for in the first place; *in camera* inspection by the court. *See Kerr v. United States District Court*, 426 U.S. 394, 405, 96 S.Ct. 2119, 2125, 48 L.Ed.2d 725 (1976); *United States v. Nixon*, 418 U.S. 683, 706, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974); *Bogosian v. Gulf Oil Corp.*, 738 F.2d 587, 596 (3d Cir.1984).

### III.

### Work Product Privilege

 Unlike the attorney client privilege, the work product privilege is governed, even in diversity cases, by a uniform federal standard embodied in Fed.R.Civ.P. 26(b)(3), which provides:

*Trial Preparation: Materials.* Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

The district court's ruling that the work product privilege is inapplicable to documents containing mental impressions of anyone other than a lawyer is inconsistent with the plain language of the rule. The rule, applicable to civil cases, is a codification of the federal common law rule announced in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), and that rule applies even in criminal cases. *United States v. Nobles*, 422 U.S. 225, 236, 95 S.Ct. 2160, 2168, 45 L.Ed.2d 141 (1975). In the latter context the Supreme Court has observed that while the rule shelters the mental processes of any attorney, it is not so restricted. Rather,

... the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect materials prepared by agents for the attorney as well as those prepared by the attorney himself.

*Id.* at 238–39, 95 S.Ct. 2170. Accordingly, federal courts have consistently ruled that the work product doctrine is not inapplicable merely because the material was prepared by or for a party's insurer or agents of the insurer. *See Railroad Salvage of Conn. Inc. v. Japan Freight Consolidators (U.S.A.), Inc.*, 97 F.R.D. 37, 41 (E.D.N.Y.1983) (holding that correspondence between defendant and its liability carriers was protected), *aff'd*, 779 F.2d 38 (2d Cir. 1985); *Home Ins. Co. v. Ballenger Corp.*, 74 F.R.D. 93, 101 (N.D.Ga.1977) (protecting from discovery a report to plaintiff insurer's home office made by plaintiff's regional claims supervisor). Counsel for an insurer may invoke work product protection in favor of documents prepared by it in anticipation of litigation even though the insurer is not a named party in an action. *See Basinger v. Glacier Carriers, Inc.*, 107 F.R.D. 771, 772–73 (M.D.Pa.1985) (non-party liability insurer was entitled to a Rule 26(c) protective order as to materials it prepared in anticipation of litigation). In *Hoffman v. Owens–Illinois Glass Co.*, 107 F.R.D. 793, 794 (D.Mass.1985), the court held that a workers' compensation insurer, holding a subrogation interest in an action brought by the claimant against the manufacturer of a defective machine, was the claimant's "representative" for purposes of asserting the work product doctrine. The *Hoffman* holding is closely in point for

purposes of the instant case, and is unquestionably sound.

It is clear, therefore, that the court erred in holding that the work product privilege applies only to documents reflecting the attorney's mental impressions. Thus the additional reason relied on for the entry of an order imposing the dismissal sanction cannot be relied upon to sustain it. As with the documents on which a claim of attorney client privilege was made, those on which a work product privilege claim was made must be inspected by the court *in camera* and ruled upon.

### IV.

#### Requests for Admission

 Bethlehem and Interstate contend that the district court's ruling on United's answers to requests for admission is not properly before us, because the court reserved decision on the motion to reconsider that ruling. While United's motion for reconsideration was not ruled upon prior to the order dismissing the complaint with prejudice, the record at the time of that final judgment contained the court's undisturbed ruling that the requests would be deemed admitted. On an appeal from a final judgment an appellate court may ordinarily consider all prior rulings of the trial court. If the court had indicated on May 15 that it was ready to reconsider its ruling on the requests for admission in its entirety, we might find persuasive the argument of Bethlehem and Interstate that there was no need to address that ruling. It is clear from the transcript of the May 15 hearing, however, that the court denied United's motion to reconsider the adequacy of its challenged responses. Nothing was left open except further consideration of whether amended answers would be permitted. In these circumstances it is entirely appropriate to consider whether the court ruled correctly when it deemed the requests for admission to be admitted.

Fed.R.Civ.P. 36(a), which authorizes the service of requests for admission, provides as follows with respect to the form of response to such requests:

The answer shall specifically deny the matter or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter. A denial shall fairly meet the substance of the requested admission, and when good faith requires that a party qualify an answer or deny only a part of the matter of which an admission is requested, the party shall specify so much of it as is true and qualify or deny the remainder.

In this case United did deny each of the six contested requests for admission. Thus the provision in Rule 36(a) requiring a statement of reasons why the party cannot truthfully admit or deny has no application. Neither in the district court nor here has Bethlehem or Interstate made any showing that the denials did not meet the substance of the requested admissions. Neither in the district court nor here has Bethlehem or Interstate made any showing that Interstate's questions were such as required, in good faith, a partial rather than a complete denial. The defendants are at considerable disadvantage in making such a showing, since they never had an opportunity to file moving papers. United is at an even greater disadvantage, however, since it never was informed in what respects Interstate objected to their responses, and thus never had an opportunity to defend the responses in the context of the pleadings, the completed discovery, the form of the questions, and the factual and legal issues which would be tried.

The purpose of Rule 36(a) is to narrow the issues for trial to those which are genuinely contested. *See Webb v. Westinghouse Elec. Corp.*, 81 F.R.D. 431, 436 (E.D. Pa.1978); *United States v. Watchmakers of Switzerland Information Center, Inc.*, 25 F.R.D. 197, 201 (S.D.N.Y.1959). Where, as here, issues in dispute are requested to be admitted, a denial is a perfectly reasonable response. Furthermore, the use of only the word "denied" is often sufficient under the rule. *See, e.g., Continental Casualty Co. v. Brummel*, 112 F.R.D. 77, 81–82 n. 2 (D.Colo.1986); *Kleckner v. Glover Trucking Corp.*, 103 F.R.D. 553, 557 (M.D.Pa.1984). "Regardless of the subject matter of the Rule 36 request, the state-

ment of the fact itself should be in simple and concise terms in order that it can be denied or admitted with an absolute minimum of explanation or qualification." *Havenfield Corp. v. H & R Block, Inc.,* 67 F.R.D. 93, 96 (W.D.Mo.1973). "A request for an admission, except in a most unusual circumstance, should be such that it could be answered yes, no, the answerer does not know, or a very simple direct explanation given as to why he cannot answer, such as in the case of privilege." *Johnstone v. Cronlund,* 25 F.R.D. 42, 46 (E.D.Pa.1960). "Rule 36 should not be used unless the statement of fact sought to be admitted is phrased so that it can be admitted or denied without explanation." *Id.* at 45.

A comparison of the answers given and the proposed amended answers quoted in the margin illustrates the difference in function between requests for admission and discovery requests such as interrogatories, depositions, or requests for inspection. The proposed amended answers paraphrase the requests for admission, and then cross-reference discovery materials suggesting that the issues to which the requests are addressed are matters in dispute. The cross-referenced materials are all already in the possession of Bethlehem and Interstate. We are unable, even after inquiring at oral argument, to identify any way in which more specific answers to these requests would in any way facilitate the trial, or trial preparation. Thus the trial court erred when it peremptorily ruled, without examining the specific requests for admission, that United's categorical denials were unresponsive, and that a "deemed admitted" sanction should be imposed.

## V.

### Conclusion

This case illustrates that even in administering a trial calendar the proverbial admonition "haste maketh waste" is a sound rule of conduct. The district court, disinclined to take the time to examine *in camera* documents as to which claims of privilege were made, thrust upon Bethlehem and Interstate rulings on the attorney client privilege they did not seek. Those parties were put in the unenviable position of defending here a legal ruling for which no support could be found. In ruling on the work product privilege without giving United an opportunity to respond in writing the court disregarded the controlling court rule and the governing caselaw. By insisting on an oral motion with respect to answers to the requests for admissions and ruling on that motion without a response, and without examining the requests, the court deprived itself of appropriate guidance from any of the parties. Now, after great delay and expense, the case must be returned for further proceedings. The judgment dismissing United's complaint with prejudice will be reversed, and the case remanded for proceedings consistent with this opinion.