**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-2897
_____

TD BANK N.A.

v.

VERNON W. HILL, II,
                            Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 1-12-cv-07188)
Honorable Robert B. Kugler, U.S. District Judge
_____

Argued: October 22, 2018

Before: KRAUSE, COWEN, and FUENTES, *Circuit Judges*

(Opinion Filed: July 1, 2019)

Susan M. Leming, Esq.
Michael J. Miles, Esq.
William M. Tambussi, Esq.   [Argued]
Brown & Connery
360 Haddon Avenue
P.O. Box 539
Westmont, NJ 08108

Lori E. Lesser, Esq.
Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017

     *Counsel for Plaintiff-Appellee T.D. Bank N.A.*


Louis M. Barbone, Esq.
Edwin J. Jacobs, Jr., Esq.
Michael F. Myers, Esq.
Jacobs & Barbone
1125 Pacific Avenue
Atlantic City, NJ 08401


Howard S. Hogan, Esq.   [Argued]
Gibson Dunn & Crutcher
1050 Connecticut Avenue, N.W.
9th Floor
Washington, DC 20036

     *Counsel for Defendant-Appellant Vernon W. Hill, II*

Phillip R. Malone, Esq.
Ashwin Aravind
Dylan I. Scher
Stanford Law School
Juelsgaard Intellectual Property and Innovation Clinic, Mills
Legal Clinic
559 Nathan Abbott Way
Stanford, CA 94305


Jeffery T. Pearlman, Esq.
University of Southern California
Gould School of Law
699 Exposition Boulevard
Los Angeles, CA 90089

      *Counsel for Amici Intellectual Property Law
Professors*

————————————

OPINION OF THE COURT

————————————



KRAUSE, *Circuit Judge*.

This case marks the latest chapter in the bitter feud between Commerce Bank, which has since merged with TD Bank, and its former CEO, Vernon W. Hill, II. *See generally Hill v. TD Bank, NA*, 586 F. App'x 874 (3d Cir. 2014); *Commerce Bancorp, LLC v. Hill*, No. 08-cv-5628, 2010 WL

2545166 (D.N.J. June 18, 2010). Beset by acrimony, TD Bank filed this copyright lawsuit against Hill, alleging that a portion of his 2012 book infringes a neglected manuscript that Hill co-authored while CEO of Commerce Bank. In enjoining Hill from publishing or marketing his book, the District Court concluded that TD Bank owned the copyright under a letter agreement and that Hill's book irreparably violated the Bank's "right to not use the copyright." App. 9. In this denouement, we resolve certain open questions in our Circuit concerning employees' rights to their artistic creations and the proper exercise of equitable discretion.

We conclude that, although the agreement between the parties did not vest initial ownership of the copyright in the Bank by purporting to designate the manuscript a work "for hire," it did transfer any ownership interest Hill possessed to TD Bank. As a result, Hill's co-ownership defense, like his other defenses, fails. As for the imposition of injunctive relief, however, we cannot accept the District Court's sweeping conclusions, which would justify the issuance of an injunction in every copyright case. Instead of employing "categorical rule[s]" that would resolve the propriety of injunctive relief "in a broad swath of cases," courts should issue injunctive relief only if the moving party makes a sufficient showing that such relief is warranted under the particular circumstances of that case. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 393–94 (2006). Accordingly, we will vacate the District Court's permanent injunction.

4

## I. Background[1]

Described by *American Banker* as "the closest thing that the staid banking industry has to a rock star," App. 1157, Vernon W. Hill, II headed Commerce Bank from its launch as a single "store" in 1973 until June 2007, a few months before TD Bank acquired it for approximately $8.5 billion. Hill built Commerce Bank in the highly saturated commercial banking industry by emphasizing customer loyalty through initiatives such as extended hours, quick account openings, and free perks at branches. His success also brought him personal acclaim, including articles in *The Wall Street Journal*, *American Banker*, *The Guardian*, *The Philadelphia Inquirer*, and *The Daily Telegraph*.

As CEO of Commerce Bank, Hill reported to the Board of Directors and handled the day-to-day management of the Bank's affairs, including reviewing the Bank's finances, visiting its stores, and handling real estate and insurance matters. Under his employment agreement with Commerce Bank, Hill had "primary responsibility for all operations of Commerce and its subsidiaries . . . , provided that such duties are consistent with his present duties," and agreed to "devote his full time and best efforts to the business and affairs of Commerce and its subsidiaries." App. 803.

---

[1] We recount the facts largely based on the parties' statements of undisputed facts with occasional references directly to the testimony and documentary evidence cited therein. For facts bearing on summary judgment, we view the record in the light most favorable to Hill, as the losing party. *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

Notwithstanding this commitment, however, the Agreement allowed Hill to pursue "outside activities," which the Agreement did not define. App. 803.

In 2006, Hill decided to write a book about his business philosophy and more than 30-year tenure at the Bank. Seeing this as a marketing opportunity, Commerce Bank supported the endeavor by hiring a business book author, Robert Andelman, to collaborate with Hill in drafting the manuscript. Hill exchanged some emails about the project during weekdays but primarily worked on the project during evenings and weekends. Other Commerce Bank employees sometimes assisted, for example, by answering Andelman's inquiries and providing feedback about the manuscript. The final manuscript, completed in 2007, recounts Commerce Bank's history and business model from Hill's perspective. Resembling both an autobiography and a marketing tool, the 2007 manuscript included both a personal dedication to Hill's wife and "the entire Commerce team," App. 834, and a $20 gift certificate to open an account at Commerce Bank.

Commerce Bank spearheaded the publication efforts by entering into an agreement with Portfolio, a division of Penguin Books. In this publishing agreement, Commerce Bank, which is defined as the "Author," represented and warranted that it was the exclusive owner of all rights conveyed in the manuscript:

> The Author [i.e., Commerce Bank] hereby represents and warrants . . . that Vernon Hill is the sole author of the Work; that the Work is or will be Vernon Hill's next book length work . . . ; that the Author is the sole and

exclusive owner of all rights granted to the Publisher in this Agreement and has not assigned, pledged or otherwise encumbered the same; . . . that the Author has full power to enter into this Agreement and to make the grants herein contained.

App. 1142. For his part, Vernon Hill signed a letter to Portfolio that referred to an attached copy of the publishing agreement and provided:

> I hereby unconditionally guarantee, promise and agree with the Publisher, its successors and assigns that the Author [i.e., Commerce Bank] will, in all respects, faithfully perform and fulfill all obligations of the Agreement on its part to be performed and fulfilled at the time and in the manner therein provided. I also unconditionally guarantee that the Work is a work made for hire within the meaning of the United States Copyright Law and that the Author is the owner of copyright in the Work and has full power and authority to enter into the Agreement.

App. 1139. Both this letter agreement and the publishing agreement contain New York choice-of-law provisions.

But the best laid schemes of mice and men often go awry: The relationship between Hill and Commerce Bank soured, culminating in Hill's termination and TD Bank's acquisition of Commerce Bank. *See Hill*, 586 F. App'x at 877. As a result, the 2007 manuscript was never published,

7

and by April 2008, Commerce Bank terminated the publishing agreement with Portfolio.

As the years progressed, however, Hill sought to make use of certain portions of the manuscript. By July 2010, Hill had debuted his next commercial banking venture, Metro Bank UK. The bank's launch, the first in Great Britain for over a century, garnered significant press coverage on both sides of the Atlantic. Capitalizing on this comeback, Hill co-authored another book with Andelman—this one describing Hill's experiences founding Metro Bank UK, the British banking system, and Hill's pet insurance company, Petplan USA. The book, entitled *FANS! Not Customers: How to Create Growth Companies in a No-Growth World*, became available in November 2012 through online booksellers such as Amazon and barnesandnoble.com. Hill also publicized the book's launch through interviews, including with Jim Cramer, the host of *Mad Money* on CNBC, and with a columnist for the *Philadelphia Inquirer*.

The plot thickened when this new endeavor came to the attention of TD Bank. Having shelved the 2007 manuscript for years, the Bank suddenly registered it with the Copyright Office and sent take-down demands to twenty retailers alleging that Hill's book infringed its copyright. Shortly thereafter, it filed suit in the District of New Jersey for copyright infringement.

As the litigation progressed, discovery revealed that TD Bank had little actually at stake: TD Bank admitted that, at most, 16% of the book infringed the 2007 manuscript, and that it has never published the 2007 manuscript or any competing work and has no interest in doing so.

Nonetheless, in its summary judgment opinion, the District Court concluded that, because the letter agreement "deem[ed] the work to be a work made for hire," it was in fact a work for hire, vesting the copyright in the 2007 manuscript with Commerce Bank as Hill's employer. App. 35 n.10. Rejecting Hill's infringement defenses, the District Court determined that Hill had copied expressive content that was not unprotectable under the merger and *scène-à-faire* doctrines. And Hill's copying, the District Court held, was not fair use because Hill did not repurpose the copied portion; the original manuscript was unpublished; and Hill's infringement would likely result in "some impairment" to the market for the 2007 manuscript "should TD Bank ever choose to publish [it]." App. 48 (emphasis omitted). But the District Court declined to issue an injunction, explaining that TD Bank had failed to show a likelihood of continued infringement and had not addressed at all the adequacy of legal remedies or the balance of hardships.

Hill faced his peripeteia in this litigation a year later. Confronted with evidence of Hill's continued promotion of the 2012 book and distribution of complimentary copies at a local chamber of commerce event, the District Court enjoined Hill from "publish[ing], market[ing], distribut[ing] or sell[ing]" the 2012 book. App. 4. This conduct, the District Court found, irreparably harmed TD Bank by depriving it of the "right to not use the copyright." App. 9. Hill timely appealed.

## II.  Jurisdiction

There is no final judgment in this case because the District Court has stayed TD Bank's request for infringer's profits under 17 U.S.C. § 504(b) pending the outcome of this

appeal. *See Marshak v. Treadwell*, 240 F.3d 184, 190–92 (3d Cir. 2001); 28 U.S.C. § 1291. Thus, we have jurisdiction only over the District Court's "grant[]" of a permanent injunction under 28 U.S.C. § 1292(a)(1).[2] *See Marshak*, 240 F.3d at 190. Before reaching the merits of Hill's appeal, we must first address TD Bank's contention that this appeal is moot and that we lack jurisdiction to consider the District Court's summary judgment ruling, even to the extent that it served as the necessary predicate for the permanent injunction. We reject both arguments.

## A. Mootness

TD Bank first contends that this appeal is moot because Hill released a revised version of the book about a month after the District Court issued the injunction and, as TD Bank posits in a footnote to its appellate brief, "the July 7, 2016 Kindle version [of Hill's book] . . . does not infringe on the 2007 manuscript."[3] Appellee's Br. 3 n.1.

---

[2] The District Court had jurisdiction over this action under 28 U.S.C. §§ 1331, 1338(a).

[3] TD Bank's and Hill's motions to supplement the record on appeal are granted insofar as they pertain to events that transpired since the District Court's decision. *See Clark v. K-Mart Corp.*, 979 F.2d 965, 967 (3d Cir. 1992) (limitations on supplementing the record do not preclude appellate court from considering "unrebutted" evidence to determine whether an appeal is moot); *see also McKay v. Federspiel*, 823 F.3d 862, 868 (6th Cir. 2016) (appellate court may consider after-acquired evidence pertaining to the merits

Compliance with an injunction can moot an appeal if there is no "reasonable expectation" that the injunction will govern the enjoined party's future conduct or otherwise injure him. *Bell v. Wolfish*, 441 U.S. 520, 543 n.25 (1979); *see Harris v. City of Philadelphia*, 47 F.3d 1311, 1326 (3d Cir. 1995); 13B Charles Alan Wright et al., *Federal Practice & Procedure* § 3533.2.2 (3d ed. 2018). Yet TD Bank's footnote conceding that the July 7, 2016 Kindle version does not infringe the 2007 manuscript hardly constitutes the broad "unconditional and irrevocable" covenant not to sue that is needed to moot a case. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 93 (2013) (applying the voluntary-cessation doctrine). Even if we accept the footnote as legally binding, it applies only to "the July 7, 2016 Kindle version." Appellee's Br. 3 n.1. In fact, at oral argument, TD Bank's counsel refused to concede that any other version of the revised book complied with the injunction, demanding twice that Hill first "certif[y]" that he will not publish, distribute, or otherwise market the 2012 book (which sounds much like a consent decree). Third Cir. Arg. Recording at 57:48–58:06, 58:38–58:50.[4] The record also reflects that the Bank sent two letters asserting that the rewritten book may still contain copyrighted content; the latter letter threatened to bring contempt sanctions against Hill. Hill, meanwhile, continues to profess his intention "to share the earlier book." Appellant's Reply Br. 3.

---

of a claim "for the sake of thoroughness" if it would "not change the outcome" of the appeal (citation omitted)).

[4] The recording of oral argument can be found at https://www2.ca3.uscourts.gov/oralargument/audio/16-2897TDBankNAvVernonWHill.mp3.

TD Bank's other arguments on appeal are inconsistent with its assertion that this case is moot. For instance, the Bank urges us not to vacate the permanent injunction if we conclude that this appeal is moot, *see United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950), because doing so would "permit the infringing 2012 Book to become available." Appellee's Br. 3 n.3. That is to say, TD Bank does believe the injunction meaningfully constrains Hill's future conduct. And, in the same brief as its footnote concession, TD Bank accuses Hill of "continu[ing] to infringe TD Bank's copyright in the 2007 Manuscript" even "*after* the entry of the PI order." Appellee's Br. 24 n.12. TD Bank's motion to supplement the record reiterates these allegations, citing material that supposedly "evidences the District Court's prescience in finding that Mr. Hill was likely to continue infringing TD Bank's copyright." Appellee's Mot. Suppl. R. at 8 (Apr. 25, 2018).

TD Bank cannot have it both ways: Hill cannot be both a continuing infringer and fully compliant with the permanent injunction. As there is at least a reasonable likelihood that the injunction controls Hill's future conduct, this appeal is not moot. *See Bell*, 441 U.S. at 543 n.25.

### B. Scope of the Appeal

TD Bank next contends that this Court lacks jurisdiction to consider the merits of the non-appealable summary judgment order—even to the extent that the permanent injunction order rests on its determination of ownership and liability—because Hill did not separately identify the summary judgment order in his notice of appeal. We are unpersuaded.

Our interlocutory jurisdiction under § 1292(a)(1) encompasses matters "inextricably linked" with the issuance of a permanent injunction. *Marshak*, 240 F.3d at 190; *Kershner v. Mazurkiewicz*, 670 F.2d 440, 449 (3d Cir. 1982) (en banc). Applying this standard, we have previously reviewed summary judgment orders that made the determination of liability necessary for the issuance of a permanent injunction. *See, e.g.*, *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 819 (3d Cir. 2006); *Cureton v. NCAA*, 198 F.3d 107, 113 (3d Cir. 1999). Although we acquire jurisdiction only over orders specified or "fairly inferred" in the notice of appeal, we construe such notices liberally. *Wiest v. Lynch*, 710 F.3d 121, 127 (3d Cir. 2013) (citation omitted). To that end, we have held that we may review an unspecified order if (1) it is connected to those specified in the notice of appeal, (2) the intent to appeal the unspecified order is "apparent," and (3) the appellee is not prejudiced. *Id.* at 127; *Polonski v. Trump Taj Mahal Assocs.*, 137 F.3d 139, 144 (3d Cir. 1998).

Hill did not separately identify the summary judgment order in his notice of appeal. Insofar as this was error, it is understandable because Hill cannot directly appeal the summary judgment order under § 1292(a)(1). At a minimum, the summary judgment order falls within those unspecified orders that we may consider on appeal. *See Wiest*, 710 F.3d at 127. The summary judgment order established two fundamental prerequisites for issuing a copyright injunction—namely, TD Bank's ownership of the copyright and Hill's liability for infringement. The District Court also made repeated references in its permanent injunction opinion to its summary judgment decision, including incorporating by reference that order's rendition of the undisputed facts. Nor

can TD Bank seriously claim that the failure to specify the summary judgment order prejudiced it, as the record is complete and the Bank had notice of—and fully briefed—the ownership and liability issues.

Our conclusion is buttressed by the Second Circuit's decision in *Shakhnes v. Berlin*, 689 F.3d 244 (2d Cir. 2012), which held that the appellate court had jurisdiction to review the district court's grant of partial summary judgment, even though it was not specifically listed in the notice of appeal from a permanent injunction. *Id.* at 250 n.3. The summary judgment decision, the Second Circuit stressed, was "the principal legal basis" for issuing the permanent injunction and "[a]ny doubt" should have been dispelled by the injunction opinion's reference to the prior order. *Id.* We concur and conclude that our jurisdiction extends to the District Court's summary judgment decision, inasmuch as that decision resolved ownership of the copyright and Hill's liability.

## III. Discussion

We review the District Court's grant of summary judgment de novo, *Brownstein v. Lindsay*, 742 F.3d 55, 64 (3d Cir. 2014), and its grant of a permanent injunction for abuse of discretion, *Doeblers' Pa. Hybrids*, 442 F.3d at 819. A district court abuses its discretion if its decision rests on an incorrect legal standard, a clearly erroneous factual finding, or a misapplication of the law to the facts. *Id.* We may affirm on any basis supported by the record, even if it departs from the District Court's rationale. *Erie Telecomms., Inc. v. City of Erie*, 853 F.2d 1084, 1089 & n.10 (3d Cir. 1988).

To prevail at summary judgment, TD Bank needed to establish that: (1) it possessed exclusive rights in the 2007

14

manuscript, and (2) Hill's 2012 book copied protected expression without privilege. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). The Bank then needed to show that the District Court should exercise its discretion to award permanent injunctive relief. *eBay*, 547 U.S. at 391. We address each requirement in turn.[5]

## A.  Exclusive Rights in the 2007 Manuscript

TD Bank and Hill dispute whether the Bank exclusively owns the copyright in the 2007 manuscript. Hill claims that his contributions to the work make him at least a

___

[5] Although we ultimately vacate the injunction under *eBay*'s four-factor test, we decline to merely assume that TD Bank exclusively owns the 2007 manuscript and that Hill's liability defenses fail. Without resolving the issue here, we note that several circuits have held that a plaintiff must demonstrate ownership of exclusive rights to establish "standing," without explaining whether they mean this requirement is jurisdictional. *See Urbont v. Sony Music Entm't*, 831 F.3d 80, 88 n.6 (2d Cir. 2016)*; Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1171 (9th Cir. 2013); *see also Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 827 (3d Cir. 2011) (recounting that the district court dismissed the complaint for lack of standing because the plaintiff did not own any rights in the work). The Federal Circuit views the concomitant ownership requirement under the Patent Act as jurisdictional. *See, e.g.*, *Fieldturf, Inc. v. Sw. Recreational Indus., Inc.*, 357 F.3d 1266, 1268 (Fed. Cir. 2004). Resolving the ownership dispute on this appeal will put to rest any jurisdictional concerns and, along with considering Hill's liability defenses, will help advance this litigation on remand.

joint author, in which case TD Bank could not sue him for copyright infringement. *See Brownstein v. Lindsay*, 742 F.3d 55, 68 (3d Cir. 2014); *Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir. 1984). TD Bank does not dispute that Hill made an artistic contribution sufficient to secure authorial rights but contends that Commerce Bank exclusively owned the work through the letter agreement that Hill signed or because it satisfied the traditional agency criteria for determining whether a work falls within the scope of employment. Although the meaning of authorship has bedeviled philosophers and writers for centuries, *see, e.g.*, Immanuel Kant, *Critique of Judgment* 174–88 (Werner S. Pluhar trans., 1987) (1790), we can resolve it here based on the Copyright Act and controlling precedent. Hill's co-ownership defense founders if: (1) the Copyright Act's statute of limitations bars the defense, (2) TD Bank exclusively owns the manuscript under the letter agreement, or (3) Hill created it within the scope of his employment under agency-law principles. We consider these issues seriatim.

1. The Copyright Act's Three-Year Statute of Limitations Does Not Apply to Hill's Co-Ownership Defense

Before addressing the merits of Hill's co-ownership defense, we must address TD Bank's argument that the Copyright Act's three-year statute of limitations prevents us from even considering it. Typically, a statute of limitations aims to "keep stale litigation out of the courts," not to bar the "consideration of a particular defense" in timely litigation. *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 72 (1956). Hence, the Copyright Act's three-year statute of limitations does not preclude a defendant in an infringement action from

16

raising an ownership defense.[6] *Pritchett v. Pound*, 473 F.3d 217, 220 (5th Cir. 2006); *Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 163–64 (2d Cir. 2003); 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.05 (2018) (hereinafter *Nimmer on Copyright*) (observing that the Copyright Act's statute of limitations "has no purchase when a plaintiff attempts to invoke [it] . . . to defeat a defendant's position of being the pertinent author," because it operates only as a defense against claims or counterclaims). This rule holds true even if the defendant also brings an untimely ownership counterclaim. *Burne Hogarth*, 342 F.3d at 164. Thus, irrespective of whether Hill's co-ownership counterclaim is time-barred (a question we lack jurisdiction to reach), the Copyright Act's statute of limitations does not prevent Hill from raising co-ownership as a defense to TD Bank's infringement lawsuit.

### 2. The Letter Agreement Granted TD Bank Exclusive Ownership of the 2007 Manuscript

The District Court correctly determined that TD Bank exclusively owns the rights to the 2007 manuscript under the letter agreement, but it did so based on a mistaken belief that the letter agreement vested original ownership in the Bank by "deem[ing]" the work to be a work "for hire." App. 35 n.10.

---

[6] Notably, the Lanham Act does preclude a defendant from challenging, among other issues, the ownership of a registered trademark after five years if the registered owner complies with certain formalities; the Act calls these marks "incontestable." 15 U.S.C. §§ 1065, 1115(b). The Copyright Act contains no analogous provision.

17

To explain why we nonetheless affirm, we must tease out the distinction between the work-for-hire and assignment doctrines, explaining how those doctrines relate to the terms of the agreement here.

*Work-for-Hire Doctrine.* The 1976 Copyright Act's definition of a "work made for hire" reflects a "carefully worked out compromise" between the artistic guilds, whose members disfavored the work-for-hire doctrine because of their lesser bargaining power, and the major publishers, studios, and record labels, which supported a broader work-for-hire doctrine to facilitate the acquisition of rights. *Cmty. for Creative Non-Violence ("CCNV") v. Reid*, 490 U.S. 730, 745–48 & nn.11–14 (1989) (citation omitted). The Act defines a work for hire as either (1) a work created by an employee within the scope of his employment, or (2) a "specially ordered or commissioned" work if it falls within nine enumerated categories of works and the parties agree in writing to designate it as a work for hire. 17 U.S.C. § 101. The definition thus establishes "two mutually exclusive means" by which a work can attain for-hire status: the first for employees, and the second for independent contractors. *CCNV*, 490 U.S. at 742–43.

The 2007 manuscript does not meet the second definition because Hill did not serve as an independent contractor and the manuscript does not fall within any of the nine enumerated categories of works. Accordingly, the manuscript could only receive work-for-hire treatment if it satisfied the first definition—that is, if Hill, while an employee of TD Bank, created it within the scope of his employment. To determine whether a work falls within the scope of employment, courts should apply general principles of agency law. *Id.* at 738, 740–41.

In its summary judgment decision, the District Court recited these principles correctly but nonetheless accepted TD Bank's argument that the letter agreement itself vested exclusive ownership with the Bank, stating that "[l]anguage in a written instrument . . . that deems the work to be a work made for hire within the meaning of the Copyright Act may . . . vest ownership exclusively with an employer."  App. 35 n.10.

That was error.  It appears the District Court confused an original vesting of ownership under the work-for-hire doctrine with a transfer of ownership rights via an assignment.  By its terms, the Copyright Act recognizes only nine specified categories of works by independent contractors that can be deemed "for hire" through a signed writing.  17 U.S.C. § 101(2).  For an employee's work to receive for-hire treatment, by contrast, the work must actually come within the "scope of his or her employment."  *Id.* § 101(1).  Certain writings, such as negotiated employment agreements, may sometimes help clarify the scope of employment, when considered under general agency-law principles.  *See U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1018 (9th Cir. 2012); *but cf. Garcetti v. Ceballos*, 547 U.S. 410, 424–25 (2006) (observing that "[f]ormal job descriptions often bear little resemblance" to an employee's actual duties, and the mere inclusion of a task in a job description "is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties").  But a bare statement that a particular work is "for hire," says nothing about the scope of an individual's employment and cannot suffice on its own.  Had Congress intended to permit parties to "deem" works by employees as "for hire," it would have so specified in

19

subsection 101(1), just as it did for independent contractors in subsection 101(2). *Id.* But it did not. And where, as here, "Congress has shown that it knows how to [adopt a measure] in express terms," it is "particularly inappropriate" to extend that policy to another subsection lacking such language. *Kimbrough v. United States*, 552 U.S. 85, 103 (2007); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002).

Whether a writing operates to render a work "for hire" or to assign the author's interest may seem like a distinction without a difference. But that distinction, though technical, does carry some practical consequences. If a work qualifies as a work for hire, the Act treats the employer or principal as the author, and the copyright presumptively vests in the principal unless the parties execute an agreement to the contrary. 17 U.S.C. § 201(b). If a work does not satisfy the statutory definition, the author can still assign it but retains certain non-waivable rights to cancel the transfer after 35–40 years, *id.* § 203(a)(3), and—depending on the type of work— waivable moral rights in the work's proper attribution and integrity, *id.* § 106A(a). The creator of a work for hire has neither, *see id.* §§ 101, 106A(a), 203(a), so allowing parties to deem a work as "for hire" without fulfilling the statutory requirements would undercut the Copyright Act's protection of those termination and moral rights and would negate the difference between a work for hire and an assigned work.[7] That difference underscores why an employee's work created

---

[7] A work's status also determines the duration of the copyright: A work-for-hire copyright has a fixed term of 95–120 years, while an ordinary copyright generally persists for the life of the author plus 70 years. 17 U.S.C. §§ 302(b), (c).

outside the scope of employment cannot simply be "deem[ed]" for hire.

Our view accords with those of leading copyright scholars and other Courts of Appeals. The Nimmer treatise, for instance, observes that "an agreement . . . whereby works prepared by the employee that are not prepared within the scope of employment are nevertheless deemed to be 'works made for hire' will not in itself convert such works into the 'for hire' category." 1 *Nimmer on Copyright* § 5.03[B][1][b][ii]; *accord Goldstein on Copyright* § 4.3 (3d ed. 2018) (noting that, unless the work satisfies the "objective" criteria of the work-for-hire doctrine, "A's express agreement that the work prepared by A will constitute a work made for hire by B will not suffice to make the work one for hire, nor to make B the author"); F. Jay Dougherty, *Not A Spike Lee Joint? Issues in the Authorship of Motion Pictures Under U.S. Copyright Law*, 49 UCLA L. Rev. 225, 317–18 (2001) ("Parties cannot simply agree that works not within the scope of employment are works made for hire with the employer deemed the author."). Our sister circuits likewise agree that, although parties to an employment relationship can agree to alter the statutory presumption that a work-for-hire copyright vests with the employer, they cannot by contract "vary the work's status as a work made for hire." *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 670 (7th Cir. 1986) (citing M. Nimmer, *Nimmer on Copyright* § 5.03[D] (1985)); *see Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc.*, 119 F.3d 55, 62 (1st Cir. 1997); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 291 (2d Cir. 2002).

For these reasons, the District Court was mistaken in concluding that the letter agreement vested ownership in the

Bank by deeming the manuscript a work for hire. But although it affixed the wrong label, the Court's determination of ownership was correct because the agreement operated as an assignment—the issue to which we now turn.

*Assignment.* The validity and import of an assignment generally is governed by state contract law. *See Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 392 (6th Cir. 2007); *Walthal v. Rusk*, 172 F.3d 481, 485 (7th Cir. 1999). The Copyright Act merely adds that an assignment must be memorialized by an "instrument of conveyance, or a note or memorandum of the transfer, . . . in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a); *see Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 827 (3d Cir. 2011).

Here, the parties agree that New York law applies under the letter agreement's choice-of-law clause. Under that state's law, courts construe assignments using the "same rules which obtain in the interpretation of other contracts," *Crook v. Rindskopf*, 12 N.E. 174, 177 (N.Y. 1887), which include giving effect to the parties' intent as principally expressed through the words of the agreement itself, *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002). Resort to extrinsic evidence is permitted only if ambiguity exists within the four corners of the agreement. *Brad H. v. City of New York*, 951 N.E.2d 743, 746 (N.Y. 2011). If it does not, a court should construe the agreement to "carry out the plain purpose and object" of the contract and to give effect to the parties' "over-all intention." *Kass v. Kass*, 696 N.E.2d 174, 181 (N.Y. 1998) (citation omitted). The agreement need not comply with any formalities or invoke particular language to constitute an assignment; any writing will suffice as long as "the assignor has, in some fashion,

22

manifested an intention to make a present transfer of his rights to the assignee." *Deutsche Bank Nat'l Tr. Co. v. Romano*, 147 A.D.3d 1021, 1023 (N.Y. App. Div. 2007) (citation and emphasis omitted); *Whalen v. Gerzof*, 206 A.D.2d 688, 690 (N.Y. App. Div. 1994).

The letter agreement evinces that intention in both of its principal covenants. In the first, Hill acknowledged the publishing agreement, a copy of which was attached to the letter, and "guarantee[d], promise[d] and agree[d] with the Publisher . . . that the Author [i.e., Commerce Bank] will, in all respects, faithfully perform and fulfill all obligations of the Agreement." App. 1139. That publishing agreement provided that "the Author [i.e., Commerce Bank] is the sole and exclusive owner of all rights granted to the Publisher in this Agreement and has not assigned, pledged or otherwise encumbered the same; . . . that the Author has full power to enter into this Agreement and to make the grants herein contained." App. 1142. In the second covenant, Hill "unconditionally guarantee[d] that the Work is a work made for hire within the meaning of the United States Copyright Law and that the Author is the owner of copyright in the Work and has full power and authority to enter into the Agreement." App. 1139.

Hill makes much of the letter's use of the word "guarantee," for a guarantee typically describes an agreement to pay a principal obligor's debt upon that party's default; the guarantor does not become a party to the underlying agreement and assumes only secondary liability. *Midland Steel Warehouse Corp. v. Godinger Silver Art Ltd.*, 276 A.D.2d 341, 343 (N.Y. App. Div. 2000). But the mere use of the word "guarantee" in a contract "does not necessarily establish the nature of the obligation," because the term, when

read in context, may not establish a guarantor-guarantee relationship. *Brewster Transit Mix Corp. v. McLean*, 169 A.D.2d 1036, 1037 (N.Y. App. Div. 1991). In *Brewster*, for example, the New York Appellate Division concluded that a defendant assumed primary liability under an agreement providing that the party, both individually and as an officer of a corporation, "guarantee[d] to pay within the established terms for all purchases charged to my account." *Id.* at 1036. Although the agreement used the word "guarantee," the court concluded that it in fact reflected the defendant's assumption of primary liability as a co-obligor. *Id.* at 1037; *see also New York Plumber's Specialties Co. v. 91 E. End Corp.*, 366 N.E.2d 866, 867 (N.Y. 1977) (concluding that an agreement under which the "undersigned . . . guarantee[d] the full and prompt payment to you, of all indebtedness due to you" was not a guarantee despite the use of that term).

Read as a whole, the terms of the letter agreement do not manifest an intent to assume secondary liability. Although Hill's commitment "guarantee[ing], promis[ing] and agree[ing]" that Commerce Bank would fulfill its obligations could by itself suggest a guarantee, Hill separately "guarantee[d]" that the manuscript "is a work made for hire," that Commerce Bank "is the owner of copyright," and that the Bank "has full power to enter into" the publishing agreement. App. 1139. Nothing in these latter provisions resembles a true guarantee, as Hill assumed these obligations without reference to any other agreement or any other party's obligations.

Instead, Hill's commitments together convey an unmistakable intent to effect a present transfer of any interest he possessed in the manuscript. Hill's assurance that the manuscript "is a work made for hire," App. 1139, though

24

insufficient to actually render it for hire, denotes an intent to relinquish his interest in the copyright. *See* 1 *Nimmer on Copyright* § 5.03[B][1][b][ii]. The use of the definite article "the" in "[Commerce Bank] is *the* owner of copyright" also implies that Commerce Bank is the sole owner of the copyright. App. 1139; *see, e.g.*, *Edgenet, Inc. v. Home Depot U.S.A., Inc.*, 658 F.3d 662, 666 (7th Cir. 2011). And this implication gains force in the second half of that sentence, which provides that Commerce Bank has "full power" to execute the publishing agreement, because a co-owner lacks the authority to grant a truly exclusive license without the consent of all co-owners. *Brownstein*, 742 F.3d at 68; *see Davis v. Blige*, 505 F.3d 90, 101 (2d Cir. 2007). Finally, any lingering doubt is dispelled by the letter's reference to the publishing agreement, which states that Commerce Bank "is *the sole* and *exclusive* owner of all rights granted to the Publisher in this Agreement."[8] App. 1142 (emphasis added).

We recognize that courts do not lightly infer that a party has assigned his interest in a copyright, particularly given the Copyright Act's writing requirement, and in doubtful cases, a document should not be construed to divest an author completely of his ownership interest. *See Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 500 (5th Cir. 2012) (endorsed check for royalties did not constitute an assignment); *Radio Television Espanola S.A. v. New World Entm't, Ltd.*, 183 F.3d 922, 927 (9th Cir. 1999) (fax referencing a deal without any indication of its terms and

---

[8] To the extent that Hill suggests that an assignment would fail unless he entered into an agreement directly with the assignee (Commerce Bank), he is mistaken. *See* Restatement (Second) of Contracts § 327 cmt. a (1981).

25

another discussing contract negotiations did not satisfy the writing requirement); *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 564 (2d Cir. 1995) (accepting, as not clearly erroneous, the district court's finding that a stamp on an endorsed check "assign[ing] . . . all right, title and interest" without mentioning "copyright" constituted an assignment of only the physical copy of a painting). We do not decide whether any of Hill's commitments standing alone, including the failed attempt to deem the work for hire, would suffice to effect an assignment. When considered as a whole, however, the letter agreement satisfies the requirements of an assignment under both the Copyright Act and New York law, and we will affirm the District Court's ownership determination on this basis.[9]

---

[9] Our dissenting colleague slices TD Bank's argument thinly, arguing that we should not affirm because it "waived" the assignment issue. While we take this opportunity to clarify that a work cannot fall within the scope of employment without satisfying agency-law criteria, the District Court's contract-law analysis, though adopting incorrect nomenclature, was sound. In fact, Hill (correctly) observes in his opening brief that the District Court conflated the two doctrines and therefore devotes more than four pages to the assignment question (even labeling it as such). In considering whether Hill assigned any interest he had, we do not stray from the passages in the agreements that TD Bank identified in its interrogatory response as giving it exclusive ownership and that the parties dispute on appeal. Where two arguments relate so closely, neither is waived or forfeited. *See, e.g.*, *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 380 (1995) (considering an alternative argument where

26

the petition, "though couched in terms of a different but closely related theory, fairly embraced [it]").

In any event, we may affirm on any ground supported by the record as long as the appellee did not *waive*—as opposed to *forfeit*—the issue. *Compare Bistrian v. Levi*, 912 F.3d 79, 88–89 (3d Cir. 2018) (affirming in part based on a "threshold question of law" that the appellees neither raised below nor on appeal), *with Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 336 (3d Cir. 2009) (appellee waived a separate argument by "explicitly disclaim[ing]" it). Much like the other statements our dissenting colleague references, the Bank's response to a request for admission admitted the lack of an assignment only "*to the extent that*" the Bank argued that initial ownership had already vested with the Bank under the same agreement. App. 1307 (emphasis added). A request for admission does not serve as a proper substitute for a contentions interrogatory, *see United Coal Cos. v. Powell Const. Co.*, 839 F.2d 958, 967–68 (3d Cir. 1988), and Hill neither sought clarification of TD Bank's response nor moved to have the matter deemed fully admitted, *see* Fed. R. Civ. P. 36(a)(6); 8B Charles Alan Wright et al., *Federal Practice & Procedure* § 2260 (3d ed. 2019). The Bank has consistently argued that it exclusively owns the 2007 manuscript under the letter agreement, and we see no reason to treat its mislabeling of that substantially correct contract-law argument as the "intentional relinquishment . . . of a known right." *Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 187 (3d Cir. 2019).

### 3. Whether the Manuscript Fell Within the Scope of Hill's Employment

Although the letter agreement constitutes a valid assignment, the question remains whether the 2007 manuscript fell within the scope of Hill's employment. If it did, the work would receive for-hire treatment and Hill would lack any right to terminate the assignment. *See* 17 U.S.C. § 203.

This Court has not had occasion to expound on when a work falls within the scope of employment. *CCNV*, however, held that the terms "employee" and "scope of employment" should be construed in light of general principles of agency law, citing section 228 of the Restatement (Second) of Agency. 490 U.S. at 740. Taking their cue from *CCNV*, other Courts of Appeals have concluded that a work falls within the scope of employment only if "[1] it is of the kind he is employed to perform; [2] it occurs substantially within the authorized time and space limits; and [3] it is actuated, at least in part, by a purpose to serve the [employer].'" *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 571 (4th Cir. 1994) (quoting Restatement (Second) of Agency § 228 (1958)) (internal alterations omitted); *see U.S. Auto Parts Network*, 692 F.3d at 1015; *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 186 (2d Cir. 2004).

We agree with our sister circuits that *CCNV* counsels in favor of adopting the Second Restatement's test. The second factor, however, deserves further explication: Although the test is phrased in the conjunctive, meaning that all three factors must be satisfied for a work to receive for-hire treatment, courts must consider time and spatial bounds with care. This factor is most probative for employees who

28

work shifts or otherwise have regular hours and definite workplaces. *See, e.g.*, *City of Newark v. Beasley*, 883 F. Supp. 3, 6, 8–9 (D.N.J. 1995) (law enforcement training course developed by a police officer while "off duty" fell outside the time and spatial boundaries of his employment). In our increasingly mobile work culture, however, many executives and professionals—for better or worse—lack obvious temporal or spatial boundaries for their work. *See* Restatement (Third) of Agency § 7.07 cmt. b (2006) (explaining that the Third Restatement abandoned this factor because it "does not naturally encompass the working circumstances of many managerial and professional employees"). For such employees, the second factor will illuminate little, and a fact-finder cannot indulge in the fiction of a 9-to-5 workday. On the other hand, even when an employee's position has ascertainable temporal and spatial boundaries, her unilateral decision to continue working at home or beyond normal hours has little bearing if a copyrighted work is clearly "of the kind" that the employee was hired to create. *Avtec Sys.*, 21 F.3d at 571; *U.S. Auto Parts Network*, 692 F.3d at 1018; 1 *Nimmer on Copyright* § 5.03[B][1][b][i].

Unfortunately, we are without the benefit of an opinion below applying the scope-of-employment test because the District Court considered only the effect of the letter agreement. App. 35 n.10. In a similar circumstance, after clarifying the agency-law principles that the district court should apply, the Fourth Circuit remanded the case, concluding that it was "not in a position to resolve that heavily fact-laden issue in the first instance." *Avtec Sys.*, 21 F.3d at 573. We will follow the same course here, as the issue is close and may require the trier of fact to resolve

29

underlying factual disputes. *Cf. MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.*, 952 F.2d 769, 778 (3d Cir. 1991). Of course, Hill may choose to forgo this inquiry, but it is not academic because it would determine whether Hill or his successors may eventually terminate the assignment. *See* 17 U.S.C. § 203. We thus will leave it to the parties on remand to decide if they wish to open yet another chapter in this litigation.

## B. Liability for Infringement

Having concluded that TD Bank owned the exclusive rights in the manuscript, we briefly address Hill's defenses to infringement. Hill devotes a few sentences to the merger and *scenes à faire* doctrines, as well as the fair-use defense. The District Court correctly granted summary judgment to TD Bank on these defenses.

The merger doctrine prohibits the copyrighting of expression "when 'there are no or few other ways of expressing a particular idea.'" *Educ. Testing Servs. v. Katzman*, 793 F.2d 533, 539 (3d Cir. 1986) (quoting *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1253 (3d Cir. 1983)). A variation on the merger doctrine, the *scenes à faire* doctrine leaves unprotected "incidents, characters or settings which are as a practical matter indispensable in the treatment of a given topic." *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222, 1236 (3d Cir. 1986) (citation and internal alteration omitted). Hill could express his life story and business philosophy in numerous ways, so the District Court properly concluded that the copied portions of the prior work were copyrightable.

30

As for fair use, the 2012 book was not transformative—i.e., it did not imbue the prior work with "new expression, meaning, or message"—so the permissible scope of fair use is more circumscribed. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994). Given this, as well as Hill's commercial sales of the 2012 work, the unpublished nature of the 2007 manuscript, and the potential harm to the market for the original manuscript if TD Bank ever elected to publish it, the District Court correctly granted summary judgment to TD Bank on Hill's fair-use defense. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562, 563, 566–68 (1985).

## C. Propriety of the Injunction

Finally, we turn to the propriety of the District Court's permanent injunction banning the "publish[ing], market[ing], distribut[ing] or sell[ing]" of Hill's 2012 book. App. 4. As a matter entrusted to a court's equitable discretion, an injunction "does not follow from success on the merits as a matter of course." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). Instead, even after prevailing on the merits, the party seeking a permanent injunction must make a sufficient showing that (1) it will suffer irreparable injury, (2) no remedy available at law could adequately remedy that injury, (3) the balance of hardships tips in its favor, and (4) an injunction would not disserve the public interest. *eBay*, 547 U.S. at 391. While we consider these factors holistically, the inability to show irreparable harm—or, relatedly, that a legal remedy would be inadequate—defeats a request for injunctive relief. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

Before *eBay*, this Circuit, like many others, applied a presumption of irreparable harm as long as a copyright plaintiff established a prima facie case or reasonable likelihood of success. *See Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 206 (3d Cir. 2003); *Marco v. Accent Pub. Co.*, 969 F.2d 1547, 1553 (3d Cir. 1992); *Educ. Testing Servs.*, 793 F.2d at 543; *Apple Comput.*, 714 F.2d at 1254. That presumption would go a long way toward supporting the District Court's remedy here. But we have cause to reconsider it in light of the Supreme Court's intervening guidance.

In *eBay*, the Supreme Court rejected the Federal Circuit's longstanding rule requiring, absent "exceptional" or "unusual" circumstances, the imposition of a permanent injunction after a finding of patent infringement. 547 U.S. at 393–94 (citation omitted). *eBay* held that the Federal Circuit's rule conflated rights with remedies by relying on the Patent Act's statutory "right to exclude" to create such a presumption. *Id.* at 392. Rather, absent express Congressional guidance to the contrary, district courts retain discretion in resolving requests for injunctive relief, and "such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases." *Id.* at 394. In so holding, *eBay* drew parallels to copyright law, where it had "consistently rejected" arguments that a permanent injunction should necessarily result from a finding of infringement. *Id.* at 392–93. It pointed, for example, to *Dun v. Lumbermen's Credit Association*, 209 U.S. 20 (1908), where the Court had affirmed a denial of an injunction for infringement of a reference book, agreeing with the lower courts that the infringing content was "so insignificant compared with the injury from stopping [the

32

defendant's] use of their enormous volume." *Id.* at 23. And it cited *New York Times Co. v. Tasini*, 533 U.S. 483 (2001), where, after concluding that newspapers exceeded their licenses by republishing freelance journalists' articles in electronic databases, the Court cautioned that "it hardly follows" that an injunction should issue to remedy the infringement. *Id.* at 505; *see Campbell*, 510 U.S. at 578 n.10 (observing that copyright's goals "are not always best served by automatically granting injunctive relief"); *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 499 (1984) (Blackmun, J., dissenting) (doubting that "a broad injunction" should issue even if contributory liability attached).

Although *eBay* concerned the Patent Act, we have found its logic more widely applicable. *Ferring Pharms., Inc. v. Watson Pharms, Inc.*, 765 F.3d 205, 215 (3d Cir. 2014). Thus, in *Ferring*, we abandoned our presumption of irreparable harm in Lanham Act cases as inconsistent with *eBay*'s admonition that courts may not fashion categorical rules or sweeping principles that would undermine the traditional four-factor test. *Id.* at 213 & n.7, 216. Instead, we held that an injunction may issue only if the plaintiff proves all four factors without the aid of any shortcuts. *Id.* at 216.

We have not reconsidered the presumption in copyright cases in particular since *eBay*, but several of our sister circuits have, and they have rejected it. *See, e.g.*, *CoxCom, Inc. v. Chaffee*, 536 F.3d 101, 111–12 (1st Cir. 2008); *Salinger v. Colting*, 607 F.3d 68, 77–78 (2d Cir. 2010); *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007); *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012); *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 995–96 (9th Cir. 2011); *Peter Letterese and Assocs., Inc. v. World Inst. of Scientology*

33

*Enters.*, 533 F.3d 1287, 1323 (11th Cir. 2008). Notably, *Ferring* relied on one of these decisions, *Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010), which jettisoned the presumption of irreparable harm in copyright cases because *eBay* "strongly indicates" that the principles it reaffirmed should be "the presumptive standard for injunctions in any context" and *eBay* relied on the Court's copyright jurisprudence. 607 F.3d at 78.

Based on *Ferring* and this persuasive authority, we hold today that *eBay* abrogates our presumption of irreparable harm in copyright cases. The Copyright Act does not direct courts to depart from traditional principles of equity in adjudicating requests for injunctive relief, *see* 17 U.S.C. § 502(a), and *eBay*'s reliance on the Court's copyright decisions makes its applicability even clearer here than in *Ferring*. Accordingly, a court considering the propriety of a copyright injunction should no longer place a "thumb on the scales" in favor of injunctive relief and inquire merely whether "there is good reason why an injunction should *not* issue." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157–58 (2010). Nor can the four-factor test be faithfully applied through a "perfunctory recognition that 'an injunction does not automatically issue,'" *id.* at 157–58 (citation omitted), or the factors' rote invocation, *see Winter*, 555 U.S. at 26–27. Irreparable harm in copyright cases "must be prove[n], not presumed." *Flexible Lifeline Sys.*, 654 F.3d at 1000 (quoting 4 *Nimmer on Copyright* § 14.06[A][5]).

With these principles in mind, we consider whether the District Court abused its discretion in issuing this injunction.

1.  Irreparable Injury

To obtain a permanent injunction, a moving party must show that it will suffer irreparable harm that is causally attributable to the challenged infringement. *See Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 982 (9th Cir. 2011); *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1363 (Fed. Cir. 2013) (Patent Act). Even though TD Bank does not sell, license, or even use the infringed work and has no intention of ever doing so, it persuaded the District Court that Hill's supposed continuing infringement irreparably harmed the Bank by depriving it of the "right to not use the copyright." App. 9. We disagree. Neither the prospect of continued infringement nor the "right to not use" a copyright establish irreparable harm.

At the outset, we can easily dismiss TD Bank's contention that continued copyright infringement necessarily constitutes irreparable harm. While a "substantial likelihood" of continuing infringement is necessary to obtain permanent injunctive relief, *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 29 (1st Cir. 2016); *see Ferring*, 765 F.3d at 219, the continuing nature of the infringement does not mean that any future injury would be irreparable, *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1215 (C.D. Cal. 2007); *see Nichia Corp. v. Everlight Americas, Inc.*, 855 F.3d 1328, 1333 (Fed. Cir. 2017) (affirming a district court's conclusion that a patentee failed to show that the defendants' "continuing infringement . . . has caused, and will continue to cause, irreparable harm"). Indeed, the Federal Circuit has recognized that, after *eBay*, irreparable harm can no longer be presumed based on continued infringement and a likelihood of success on the merits. *See Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149

35

(Fed. Cir. 2011); *see also Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994) (presuming irreparable harm before *eBay* upon a "strong showing of likelihood of success on the merits coupled with continuing infringement"). If continued infringement does not justify a *presumption* of irreparable harm, *a fortiori* it does not inherently give rise to irreparable harm. Instead, the prospect that infringement will continue merely precipitates the question whether any future infringement would irreparably injure the copyright owner.

The District Court's reliance on "the right to not use the copyright" fares no better. *See* App. 9. Such a right is little more than a rephrasing of the right to exclude, which *eBay* held did not justify a presumption of irreparable harm. *See* 547 U.S. at 392–93. Even when this Court presumed irreparable harm, we required "a stronger showing of irreparable harm" if the infringed copyright was "peripheral to the copyright holder's business." *Video Pipeline*, 342 F.3d at 206 (citation and internal alterations omitted). Holding that a violation of "the right to not use the copyright" necessarily amounts to irreparable harm would not only resurrect the presumption of irreparable harm, but make it irrebuttable, even where, as here, the infringement bears only a tangential relation to the copyright holder's business. *Cf. High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1556 (Fed. Cir. 1995) (reversing the issuance of a preliminary injunction where the patentee did "not make or sell [the relevant products] and [did] not license their manufacture and sale").

Our position that a violation of "the right to not use [a] copyright" does not inherently establish irreparable harm finds further support in the Ninth Circuit's en banc decision in *Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015).

36

There, an actor who allegedly was duped into making a five-second performance for the anti-Muslim movie *Innocence of Muslims* sought an injunction to remove the movie from YouTube because its release resulted in a fatwa against her and threats against her family. *Id.* at 737–39. The en banc court noted that the actor's alleged harms, though disturbing, bore little relation to any interest protected by copyright law. *Id.* at 745. Copyright law grants authors exclusive rights in their expressive works to incentivize "the creation and publication of free expression"—not to protect an author's privacy or reputation. *Id.* at 744–45 (quoting *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003)). In seeking to remove the work (or at least her five-second performance) from YouTube, the Ninth Circuit concluded, the actor had not demonstrated any harm, much less irreparable harm, cognizable in copyright.[10] *Id.* at 746. We express no opinion on the Ninth Circuit's ultimate holding, but its premise is one on which we agree: A bare violation of a statutory right enshrined in the Copyright Act does not establish irreparable harm.

In holding otherwise, the District Court relied on the Second Circuit's decision in *Salinger*, which mused that "a copyright holder *might* . . . have a First Amendment interest in not speaking" and later asserted that "'[t]he loss of First Amendment freedoms,' and hence infringement of the right not to speak, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" 607 F.3d at 81 (emphasis added) (citation omitted). We do not view the

---

[10] *Garcia* accepted that a court may consider these collateral injuries where a copyright owner has a "strong copyright claim." *Id.* at 746.

Second Circuit as holding that copyright infringement amounts to compelled speech in violation of the First Amendment. For one, *Salinger* vacated the district court's grant of a preliminary injunction and stressed that irreparable harm must be proven. *Id.* at 82, 84. Equating copyright infringement with compelled speech would justify an injunction whenever, as in *Salinger*, an author chooses not to distribute a work. In addition, *Salinger* reiterated that copyright law aims to protect "the commercial interest of the artist/author" and "not to coddle artistic vanity or to protect secrecy." *Id.* at 81 n.9 (emphasis omitted) (quoting *New Era Publ'ns Int'l, ApS v. Henry Holt & Co.*, 695 F. Supp. 1493, 1526 (S.D.N.Y. 1988) (Leval, J.)). Yet secrecy is exactly what would be protected if the unauthorized distribution of a work were deemed an irreparable violation of the original author's right not to speak.[11]

---

[11] Nor would characterizing copyright infringement as compelled speech make much sense. Most obviously, copyright infringement generally lacks the state action needed to implicate the First Amendment. *See Max v. Republican Comm. of Lancaster Cty.*, 587 F.3d 198, 200 (3d Cir. 2009). And even if it did, infringement would not equate with compelled speech because, regardless of whether the author takes offense, the infringer's use does not coerce the copyright owner to "personally speak the government's message" or "to host or accommodate another speaker's message" so that "the complaining speaker's own message was affected." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 63 (2006). Indeed, precisely because few authors would license their work for criticism or ridicule, copyright's fair-use defense provides special

For these reasons, the District Court should not have relied on Hill's violation of the "right to not use [a] copyright" alone to establish irreparable harm, App. 9, and because it did, it abused its discretion. *See Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 n.2 (2014).

2. Adequate Remedy at Law

Although *eBay* identified irreparable harm and the adequacy of legal remedies as separate considerations, they typically constitute two sides of the same inquiry, for the "availability of adequate monetary damages belies a claim of irreparable injury." *Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008) (citation omitted); *see* Samuel L. Bray, *The Supreme Court and the New Equity*, 68 Vand. L. Rev. 997, 1026–27, 1048 (2015) ("[T]hese formulations are customarily interchangeable."). Below, the District Court concluded that, because Hill was distributing the 2012 book for free, TD Bank's injury "is . . . not easily quantifiable or compensable at law." App. 10. This, too, was error.

---

protection to derivative works like parodies. *See Campbell*, 510 U.S. at 579–81; *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1271 (11th Cir. 2001). Nor have the Copyright Act's longstanding compulsory licensing provisions, *see, e.g.*, 17 U.S.C. § 111 (compulsory cable license); 17 U.S.C. § 115 (compulsory cover license), ever come under serious First Amendment challenge as compelled speech.

Under the Copyright Act, a copyright holder may recover either actual damages and the infringer's profits or statutory damages. 17 U.S.C. § 504(a). Other circuits have interpreted the Act's allowance of "actual damages" to permit reasonable royalty damages. *See, e.g.*, *On Davis v. The Gap, Inc.*, 246 F.3d 152, 163–72 (2d Cir. 2001); *Dash v. Mayweather*, 731 F.3d 303, 312 (4th Cir. 2013); *MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc.*, 622 F.3d 361, 366 (5th Cir. 2010). As a condition of denying a permanent injunction, a district court may impose a running royalty to remedy possible future infringement, at least after providing the parties with an opportunity to negotiate a rate privately. *See Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1377 (Fed. Cir. 2017) (Patent Act); 4 *Nimmer on Copyright* § 14.06[D] (2018). A reasonable royalty and statutory damages may be imposed even if the accused infringer reaps nothing from infringement. *See F. W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 233 (1952) (allowing statutory damages "[e]ven for uninjurious and unprofitable invasions of copyright"); *On Davis*, 246 F.3d at 166 (recognizing that reasonable royalty damages may be awarded even if the infringement proves unprofitable). Given this arsenal of monetary remedies, a district court can still award meaningful monetary relief where, as here, an accused infringer distributes an infringing product for free and the copyright holder makes no use of a work.

TD Bank protests that it abandoned its request for statutory damages, so it lacks an adequate remedy at law. But where an adequate remedy at law exists, "the party seeking redress *must* pursue it." *Parker v. Winnipiseogee Lake Cotton & Woolen Co.*, 67 U.S. 545, 551 (1862) (emphasis added); *see Goadby v. Philadelphia Elec. Co.*, 639 F.2d 117, 122 (3d

40

Cir. 1981); *Shaw v. United States*, 891 F.2d 602, 603 (6th Cir. 1989). TD Bank therefore cannot bolster its case for equitable relief by abandoning its request for statutory damages.

To be clear, we in no way suggest that all copyright infringement can be adequately remedied through damages; that "categorical rule" would flout *eBay* just as much as a rule favoring injunctive relief. *See* 547 U.S. at 393. The availability of some legal remedy does not mean such a remedy is adequate. But, at a minimum, where the copyright holder presents no evidence of actual harm and relies solely on the exclusive nature of the rights conferred by the Copyright Act, a district court abuses its discretion by concluding that the copyright holder lacks an adequate remedy at law.

### 3. Balance of Equities

The District Court's balance-of-harms analysis suffers from much the same flaws as its irreparable-injury determination: It relied solely on TD Bank's "property interest in its copyrighted material"—in other words, the right to exclude—and dismissed any hardship that the injunction would inflict on Hill because "Hill has a property interest in the 2012 Book only to the extent [it] does not infringe the 2007 Manuscript." App. 10. But by that measure, the balance of hardships would always favor the copyright holder.

At least three considerations inform how much credence to give a defendant's claimed hardship: (1) whether the defendant's own financial investment, effort, or expressive contribution eclipses the infringing aspect, *see*

41

*Silverstein v. Penguin Putnam, Inc.*, 368 F.3d 77, 84–85 (2d Cir. 2004); *Abend v. MCA, Inc.*, 863 F.2d 1465, 1479 (9th Cir. 1988), (2) how easily the infringing content could be separated from the defendant's product,[12] *see Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990); *Abend*, 863 F.2d at 1479, and (3) the degree to which the defendant reasonably believed his conduct was non-infringing, *see Opticians Ass'n of Am.*, 920 F.2d at 197; *Helene Curtis Indus., Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1333 (7th Cir. 1977). All three factors play a role; no matter how much a defendant invests in a product and how deeply intertwined that investment is with the infringing content, a wanton infringer may deserve little sympathy from a court contemplating equitable relief. *See Opticians Ass'n of Am.*, 920 F.2d at 197; *Kos Pharm. v. Andrx Corp.*, 369 F.3d 700, 728–29 (3d Cir. 2004) (refusing to countenance "a *knowing* infringer that constructs its business around its infringement" (emphasis added) (citation and internal alterations omitted)); *see also* Douglas Laycock & Richard L. Hasen, *Modern American Remedies* 419–20, 446–47 (5th ed. 2019) (stressing the defendant's culpability *vel non*). But

---

[12] We note that the question of separability in the balance of hardships differs from that at issue in the merger doctrine. The merger doctrine, as a narrow defense to liability, considers *ex ante* whether an idea could have been expressed in numerous ways, *see Educ. Testing Servs.*, 793 F.2d at 539, while the balance of hardships assesses afterwards how practicable extricating the infringing content from the defendant's product would be, given obstacles such as sunk costs and path dependency, *see Abend*, 863 F.2d at 1479.

even where a defendant makes a strong showing, a copyright holder's hardship may be so devastating that the balance of equities nevertheless tips in its favor. *See, e.g., Opticians Ass'n of Am.*, 920 F.2d at 197; *Abend*, 863 F.2d at 1479 (declining to issue injunction where the success of the infringing work "resulted in large part from factors completely unrelated to the underlying story" and "defendants could not possibly separate out [their contributions] from the underlying work"). In short, balancing aims "to ensure that the issuance of an injunction would not harm the infringer more than a denial would harm the [copyright] owner." *Opticians Ass'n of Am.*, 920 F.2d at 197.

Here, considering the interests on both sides, the balance of equities favors neither party. TD Bank has not submitted any evidence of actual harm, much less irreparable harm. But the equities do not particularly favor Hill either. True, as TD Bank admits, no more than 16% of Hill's 2012 book infringes its copyright, and Hill's ownership defense, though ultimately unsuccessful, had considerable merit. And, without TD Bank's recent concession that the 2016 book does not infringe its copyright, we would need to scrutinize whether the book could practically be rewritten in a non-infringing manner without detracting from Hill's story or voice. With the benefit of hindsight and TD Bank's recent concession, however, we know that Hill needed only about one month to develop a non-infringing version. Under these circumstances, we decline to hold that the equities weigh in either party's favor.

4. Public Interest

Hill and *amici* contend that the District Court erred in discounting the harm that the injunction could inflict on the

43

American public by depriving it of the ability to purchase the work from any lawful source. To determine where the public interest lies, a court should weigh the "advantages and disadvantages" to the public of "employing the extraordinary remedy of injunction over the other available methods of enforcement." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 498 (2001) (citation omitted). We agree that this factor weighs against the injunction: Copyright leaves a narrow but important role for weighing the public's right to access expressive works, at least where a copyright owner pursues an injunction not to safeguard the commercial marketability of a work but merely to suppress unwelcome speech.

Though not "categorically immune from challenges under the First Amendment," copyright law generally does not invite First Amendment scrutiny, insofar as "copyright's built-in free speech safeguards"—in particular, the idea-expression dichotomy and fair use—adequately guarantee free expression. *Eldred*, 537 U.S. at 221 (citation omitted); *see Harper & Row*, 471 U.S. at 555–60. And copyright law strives to spur the creation and diffusion of free expression by granting authors "a marketable right to the use of one's expression." *Id.* at 558. For these reasons, the Supreme Court has rebuffed constitutional challenges that would have enlarged the fair-use doctrine, *id.* at 560, or invalidated Congress's retroactive extensions of copyrights, *Eldred*, 537 U.S. at 221; *Golan v. Holder*, 565 U.S. 302, 335–36 (2012).

Yet it hardly follows that the public interest always favors granting injunctive relief or that, in exercising its remedial discretion, a court must ignore whether an injunction would indefinitely preclude the public from accessing a work. To the contrary, the Supreme Court has recognized that

injunctive relief does not always serve copyright's goal of "stimulat[ing] the creation and publication of edifying matter." *Campbell*, 510 U.S. at 578 n.10 (citation omitted). By considering the public's interest in accessing works, a court does not disturb copyright's liability regime, *see Eldred*, 537 U.S. at 221; *Golan*, 565 U.S. at 324, but rather exercises its centuries-old authority to choose between alternative "means of enforcing the statute." *Oakland Cannabis Buyers' Coop.*, 532 U.S. at 497–98; *see* II Joseph Story, *Commentaries on Equity Jurisprudence* 271 (3d ed. 1843) (commending the "wisdom" of courts of equity in "constantly declin[ing] to lay down any rule, which shall limit their power and discretion as to the particular cases, in which such injunctions shall be granted, or withheld").

Consistent with this view, the Supreme Court and other Courts of Appeals have emphasized the right of access to works of public interest. For example, in a case cited approvingly by the Supreme Court as an example of where the public interest opposed injunctive relief, *see Campbell*, 510 U.S. at 578 n.10, the Ninth Circuit refused to enjoin the classic Hitchcock movie "The Rear Window" partly because "an injunction could cause public injury by denying the public the opportunity to view a classic film for many years to come," *Abend*, 863 F.2d at 1479. The Second Circuit likewise vacated an injunction enjoining a biography about Howard Hughes that allegedly infringed copyrights that Hughes had acquired to suppress the work, with a two-judge concurrence pointing out that the "spirit of the First Amendment" counsels against allowing anyone to use copyright to "interfere[] with the public's right to be informed regarding matters of general interest." *Rosemont Enters., Inc. v. Random House, Inc.*, 366 F.2d 303, 311 (2d Cir. 1966); *see*

45

*also Suntrust Bank*, 268 F.3d at 1276 (stressing "the public interest is always served in promoting First Amendment values").

By recognizing the public's interest in accessing intriguing works, we do not countenance blatant piracy or indulge in second-guessing of a copyright holder's business model. *Cf. Campbell*, 510 U.S. at 578 n.10 (focusing on derivative works). And, even where the public interest in accessing works may appropriately be considered, a district court may well conclude that the public interest nevertheless favors injunctive relief. *Cf. Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 867 (9th Cir. 2017) (concluding that a district court did not abuse its discretion in issuing injunction relief even though the content owners did not offer a competing service). But, at least where a copyright holder wields its exclusive rights to suppress unwelcome speech, a district court's public-interest analysis should consider a work's continued availability.

Hill may perhaps not be the next prize-winning, or even best-selling, business-book author. But he has a story to tell and readers eager to learn from him. This injunction deprived the American public of the ability to purchase this book from any lawful source for the foreseeable future. At the same time, whatever spurred TD Bank to bankroll this copyright litigation, it was not a desire to protect the commercial value of the 2007 manuscript: By its own admission, TD Bank has no real intention of ever publishing or licensing that work.

This injunction also inflicted a far more subtle and insidious harm on the public by placing Hill in jeopardy of a contempt finding for sharing anything that "sound[s] too

46

much *like himself* in the 2007 manuscript." Br. of Amici Intellectual Property Law Professors at 13. In this manner, a copyright injunction can limit the public's access to expressive content well beyond the work at issue in a lawsuit. Far from hypothetical, that danger came true here when TD Bank threatened to bring a contempt motion against Hill for the 2016 book, which it did not retract until its appellate response brief. A less financially secure defendant may well have given up. Thus, on balance, the public interest here also militates against this permanent injunction.

\* \* \* \*

As an appellate court, we police only the margins of a district court's exercise of equitable discretion. But where, as here, a district court strays from a context-specific analysis and relies instead on broad propositions, it exceeds the bounds of its discretion. In this case, no invocation of abstract principles can obscure that TD Bank suffered no actual harm from Hill's infringement and the Bank had adequate remedies at law. As such, although we will affirm the District Court's grant of summary judgment to TD Bank on ownership and liability, we will vacate the permanent injunction and remand for further proceedings consistent with this opinion.

47

COWEN, concurring in part and dissenting in part.

I join in full Parts II and Parts III.A.1, III.A.3, III.B, and III.C of the majority opinion, and I agree that we must vacate the District Court's permanent injunction. I also join Part III.A.2 insofar as the majority determines that "the District Court was mistaken in concluding that the letter agreement vested ownership in the Bank by deeming the manuscript a work for hire." (Majority Opinion at 21-22.) However, I must respectfully dissent from Part III.A.2's assignment analysis. TD Bank has waived this assignment issue, and, in any event, Hill's commitments fail to "convey an unmistakable intent to effect a present transfer of any interest he possessed in the manuscript" (id. at 24). Accordingly, I would vacate the District Court's grant of summary judgment on the threshold question of ownership and remand for further proceedings.

"[W]e may affirm on any basis supported by the record, even if it departs from the District Court's rationale." (Id. at 14 (citing Erie Telecomms., Inc. v. City of Erie, 853 F.2d 1084, 1089 & n.10 (3d Cir. 1988)).) "However, this rule does not apply to cases in which the party has waived the issue in the district court." Holk v. Snapple Beverage Corp., 575 F.3d 329, 335 (3d Cir. 2009). "This Court has stated: 'We may affirm the lower court's ruling on different grounds, provided the issue which forms the basis of our decision was before the lower court.'" Id. at 335-36 (quoting Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 904 n.1 (3d Cir. 1997)). A review of "the record" in this case reveals that TD Bank has intentionally and knowingly abandoned the issue of assignment. See, e.g., Robinson v. First State Cmty. Action Agency, 920 F.3d 182, 187 (3d Cir. 2019) ("'Waiver is the

1

'intentional relinquishment or abandonment of a known right.'" (quoting <u>Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.</u>, 877 F.3d 136, 147 (3d Cir. 2017))).

It is undisputed that TD Bank failed to argue below that, even if the 2007 manuscript does not rise to the level of a work for hire, Hill assigned any interest he may have had in the manuscript to Commerce Bank. But TD Bank did more than merely fail to raise a particular issue. It affirmatively conceded that the letter "is not an assignment."

In "Plaintiffs' Responses to Defendant's First Set of Requests for Admissions," TD Bank made the following admission:

> 26. Admit that Mr. Hill never signed a document or any other writing assigning right, title or interest in the Unpublished Manuscript to Commerce.
>
> **OBJECTION:** Plaintiff objects as "any other writing" is vague and is nowhere defined and requires Plaintiff to speculate as to meaning.
>
> **RESPONSE:** Subject to the foregoing objection and without waiving the same, admitted to the extent that the Guaranty is not an assignment but rather an acknowledgement that Commerce is the *initial* owner of the copyright in the Unpublished Manuscript.

2

(JA1307; see also id. (making same objection and response to request to admit that Hill never signed document or any other writing assigning right, title, or interest to TD Bank).)

TD Bank thereby admitted that the letter is not an assignment but rather an acknowledgement that Commerce Bank has always been the copyright owner from (to borrow language from TD Bank's appellate brief) "day one" pursuant to the work-for-hire doctrine (Appellee's Brief at 37). "The purpose of [Federal Rule of Civil Procedure] 36(a) is to narrow the issues for trial to those which are genuinely contested." United Coal Cos. v. Powell Constr. Co., 839 F.2d 958, 967 (3d Cir. 1988) (citing Webb v. Westinghouse Elec. Corp., 81 F.R.D. 431, 436 (E.D. Pa. 1978); United States v. Watchmakers of Switzerland Info. Ctr., Inc., 25 F.R.D. 197, 201 (S.D.N.Y. 1959)). TD Bank did not deny Hill's request for admission. See, e.g., id. ("Where, as here, issues in dispute are requested to be admitted, a denial is a perfectly reasonable response."). In fact, TD Bank responded to similar admission requests by denying them, quoting or referencing, inter alia, the letter, and asserting that the document spoke for itself. It also could have answered in the alternative if it really believed that the letter could be considered an assignment. For instance, it could have stated that, while the document constitutes an acknowledgement of Commerce Bank's initial ownership, "the Guaranty is an assignment" to the extent Commerce Bank is not considered to be the initial owner. But it did not do so. Instead of leaving open the possibility that it became the copyright owner by means of a transfer or assignment from the original owner (or co-owner), TD Bank went so far as to emphasize the term "initial" in "the *initial* owner." Similarly, "Plaintiff's Response to Defendant's Rule 56.1 Statement of

3

Material Facts Not in Dispute In Support of Cross-Motion for Partial Summary Judgment" stated: "Undisputed that the Guaranty does not contain such an express provision [in which Mr. Hill assigned any right, title, or interest in the Unpublished Manuscript to Commerce]." (JA1388). "Disputed that the lack of such a provision provides Mr. Hill with any ownership interest in the copyright in the 2007 Manuscript." (Id. (citing JA477, JA1139).)

TD Bank's pattern of failing to raise or contest the issue of assignment has continued on appeal.

In his opening appellate brief, Hill argues at some length that the District Court erred in relying on the letter. "The only inquiry to which these contracts might be relevant is whether, after Mr. Hill's ownership vested, he executed an agreement transferring the copyright after creation, in accordance with 17 U.S.C. § 204." (Appellant's Brief at 47-48 (citing Brownstein v. Lindsay, 742 F.3d 55, 68 (3d Cir. 2014)).) Citing to TD Bank's Responses to Defendant's First Set of Requests for Admissions, Hill asserts that "TD Bank concedes that no such writing exists," which, in turn, purportedly entitles him to judgment as a matter of law. (Id. at 48 (citing JA1307).) According to Hill, the District Court, among other things, failed to analyze the statutory writing requirement, acknowledge TD Bank's admission, properly apply New York's contract law in its consideration of the letter and the publishing agreement, or recognize that there is a presumption against transfers of copyright ownership unless they are clearly stated. In the process, Hill (indirectly) cites TD Bank's Response to Defendant's Rule 56.1 Statement of Material Facts Not in Dispute In Support of Cross-Motion for Partial Summary Judgment. (See id. ("In fact, there is no

4

evidence of *any* agreement over copyright ownership between Commerce and Mr. Hill, whose signatures never appear on the same contract." (citing JA1586)).)

Faced with these assertions, one would expect TD Bank to respond (at least in the form of an alternative argument) that Hill did assign any interest he may have had in the manuscript pursuant to § 204 and New York law. At the very least, it would be expected that a litigant would deny an adversary's concession assertion if it truly believed that no such thing had occurred. Yet TD Bank does nothing of the sort. Instead, it simply characterizes Hill's contention "[t]hat '[t]he Guaranty never says that Mr. Hill agrees to transfer exclusive ownership to Commerce'" as "a basic mistake regarding the Copyright Act's 'work made for hire' provision." (Appellee's Brief at 37 (quoting Appellant's Brief at 48).) "Because the 2007 Manuscript was a 'work made for hire,' (see [id. at 39-47]), TD Bank is the work's statutory 'author' and sole copyright owner on day one, 17 U.S.C. § 201(b), and no transfer to TD Bank is required." (Id.) According to TD Bank, it is actually Hill's obligation to produce a written agreement transferring ownership to him.

TD Bank did not argue that there was any assignment from Hill to Commerce Bank until oral argument, after this Court directed the parties to be prepared to discuss this issue of whether the letter constitutes a valid assignment under New York law and the Copyright Act. I do not believe it is appropriate for us to overlook what TD Bank (an obviously sophisticated litigant represented by able counsel) has done— and not done—regarding the issue of assignment throughout the course of this litigation. Recently, this Court considered a party's course of conduct to decide that it had waived its

5

objection to a particular jury instruction.  See, e.g., Robinson, 920 F.3d at 184 ("We hold that First State has waived this argument because of its continued acquiescence to Robinson's case theory, its encouragement of the adoption of the very jury instruction to which it now objects, and its failure to include this error in its post-trial briefing.").  In turn, the ground upon which Erie Telecommunications relied was raised in one of the appellee's affirmative defenses, summarily rejected by the district court, and then addressed in the brief that the appellee filed on appeal.  Erie Telecomms., 853 F.2d at 1088 & n.8, 1094 n.16.  Given its concession below that the letter is not an assignment as well as its dismissal on appeal of Hill's own assignment assertions, TD Bank has waived the assignment issue.

Assuming arguendo that the issue of assignment is properly before us, I do not agree with the majority's conclusion that Hill's letter meets the legal requirements for an assignment of a copyright interest.  As the majority recognizes, "courts do not lightly infer that a party has assigned his interest in a copyright, particularly given the Copyright Act's writing requirement, and in doubtful cases, a document should not be construed to divest an author completely of his ownership interest."  (Majority Opinion at 25 (citing Baisden v. I'm Ready Prods., Inc., 693 F.3d 491, 500 (5th Cir. 2012); Radio Television Espanola S.A. v. New World Entm't, Ltd., 183 F.3d 922, 927 (9th Cir. 1999); Playboy Enters., Inc. v. Dumas, 53 F.3d 549, 564 (2d Cir. 1995)).)  Under applicable New York law, a contract is unambiguous if its language possesses "'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'"

Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170-11 (N.Y. 2002) (quoting Breed v. Ins. Co. of N. Am., 385 N.E.2d 1280, 1282 (N.Y. 1978)).

The letter here is doubtful and ambiguous.

According to the majority, "Hill's commitments together convey an unmistakable intent to effect a present transfer of any interest he possessed in the manuscript." (Id. at 24.) I agree that no specific language is necessary to satisfy the requirements for an effective assignment under state and federal law. See, e.g., Radio Television Espanola, 183 F.3d at 927 ("No magic words must be included in a document to satisfy § 204(a)."); Deutsche Bank Nat'l Trust Co. v. Romano, 147 A.D.3d 1021, 1023 (N.Y. App. Div. 2017) (observing that no special language or formalities are necessary to effect assignment). Nevertheless, the assignor must in some fashion have "'*manifested an intention to make a present transfer of his rights to the assignee.*'" Deutsche Bank, 147 A.D.3d at 1023 (quoting 9-47 Corbin on Contracts § 47.7); see, e.g., Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC, 477 F.3d 383, 391 (6th Cir. 2007) ("Nevertheless, '[s]o long as the parties' intent is clear, a transfer of copyright need not include any particular language.'" (quoting Gilleland v. Schanhals, 55 F. App'x 257, 260 (6th Cir. 2003)). According to the Ninth Circuit:

> Section 204's writing requirement is not unduly burdensome; it necessitates neither protracted negotiations nor substantial expense. The rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't

7

> have to be the Magna Charta; a one-line pro
> forma statement will do.

Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 557 (9th Cir. 1990).

Neither the letter nor the publishing agreement included "a one-line pro forma statement." Specifically, the documentation at issue here did not state that Hill is assigning, transferring, or granting his copyright interest in the manuscript to Commerce Bank—nor did it say that such an assignment, transfer, or grant had already occurred (or would take place in the future). See, e.g., Baisden, 693 F.3d at 500 ("That [royalty] check merely states that it was for '*Men Cry in the Dark* Fall 2005 Royalties (Paid in Full).' The check does not expressly refer to an assignment of copyrights. See [Playboy Enters., 53 F.3d at 564] (applying clearly erroneous standard and deferring to district court's determination that check for past 'assignment . . . of all rights, title and interest' was insufficient to transfer copyrights)."). Certainly, the inclusion of this sort of language would have dispelled doubt and "convey an unmistakable intent" to effect a transfer (id. at 24). Although not strictly required as a matter of law (see id. at 25 n.8), the existence of a document executed by the putative assignor and assignee would also have been stronger evidence of an assignment than what we have here, i.e., a publishing agreement executed by Commerce Bank and Portfolio, and a letter signed by Hill addressed to Portfolio.

In turn, Hill's letter to Portfolio and the publishing agreement between Commerce Bank and Portfolio could be reasonably read as indicating that there was no copyright assignment. As the majority explains, the letter consists of

8

two principal covenants: (1) "Hill acknowledged the publishing agreement, a copy of which was attached to the letter, and 'guarantee[d], promise[d] and agree[d] with the Publisher . . . that the Author [i.e., Commerce Bank] will, in all respects, faithfully perform and fulfill all obligations of the Agreement'" (id. at 23 (quoting JA1139)); and (2) "Hill 'unconditionally guarantee[d] that the Work is a work made for hire within the meaning of the United States Copyright Law and that the Author is the owner of copyright in the Work and has full power and authority to enter into the Agreement'" (id. (quoting JA1139)). "That publishing agreement provided that 'the Author [i.e., Commerce Bank] is the sole and exclusive owner of all rights granted to the Publisher in this Agreement and has not assigned, pledged or otherwise encumbered the same; . . . that the Author has full power to enter into this Agreement and to make the grants herein contained.'" (Id. (quoting JA1142).) The documentation thereby indicates that the letter itself constitutes a guarantee as opposed to an assignment—and that Commerce Bank "is the work's statutory 'author' and sole copyright owner on day one and no transfer to [Commerce Bank] is required" (Appellee's Brief at 37 (citation omitted)).

According to the majority, the latter provisions of the letter do not resemble a true guarantee. But it also acknowledges that Hill's commitment guaranteeing, promising, and agreeing that Commerce Bank would fulfill its obligations "could by itself suggest a guarantee" (Majority Opinion at 24). While not dispositive, the repeated use of this sort of "guarantee" language (at the very least) represents a highly unconventional expression of an intent to effect a transfer. Furthermore, the cited cases did not consider

whether the "guarantee" at issue actually constituted an assignment under New York law. See, e.g., N.Y. Plumber's Specialties Co. v. 91 E. End Corp., 366 N.E.2d 866, 867 (N.Y. 1977) ("Although described as a guarantee this writing is actually an agreement or promise to pay appellant's own obligation for purchases made on its own account." (quoting Deeves & Son v. Manhattan Life Ins. Co., 88 N.E. 395, 396 (N.Y. 1909))); Brewster Transit Mix Corp. v. McLean, 169 A.D.2d 1036, 1037 (N.Y. App. Div. 1991) ("Despite the parties' use of the word guarantee, we are of the view that the nature of defendant's obligation is the same as that of his corporation and, therefore, the only reasonable interpretation of the writing is that which makes defendant a co-obligor of his corporation's debts to plaintiff, not a guarantor of the payment of those debts." (citing Am. Trading Co. v. Fish, 42 N.Y.2d 20, 24 (1977))). Even if parts of the letter do not really look like a typical guarantee (i.e., an agreement to pay a principal obligor's debt upon the principal obligor's default), the same could be said with respect to the letter's resemblance to an assignment, especially given what the document did not say (and what it did). In fact, Hill stated in the letter that "I have an interest in the Author [Commerce Bank] and in having the Work published by the Publisher," and thereby made these guarantees "as an inducement to the Publisher to enter into the Agreement." (JA1139.) He clearly wanted the book to be published as opposed to expressing any sort of interest in effecting an assignment of his existing copyright interest to his employer. In fact, I question whether he was really concerned with the intricacies of copyright assignment and the work-for-hire doctrine in the first place.

Finally, the differences between assignment and the concept of a work for hire weigh against the majority's

10

assignment determination. The agreement and the letter could be reasonably read as acknowledging that Commerce Bank was always the exclusive owner of the manuscript as a work for hire. After all, the letter basically said as much, unconditionally guaranteeing that the manuscript "is a work made for hire within the meaning of the United States Copyright Law and that the Author is the owner of copyright in the Work and has full power and authority to enter into the Agreement." (JA1139.) Commerce Bank warranted in the publishing agreement that it "is the sole and exclusive owner of all rights granted to the Publisher in this Agreement" and "has full power to enter into this Agreement and to make the grants herein contained." (JA1142.) The majority asserts that, although Hill's assurance that the manuscript is a work made for hire is insufficient to make it one, this assurance nevertheless "denotes an intent to relinquish his interest in the copyright." (Majority Opinion at 25 (citing 1 Nimmer on Copyright § 5.03[B][1][b][ii])).) However, assignment and work for hire are two different concepts. As I have already explained in my waiver discussion, TD Bank characterizes Hill's assignment assertions as fundamentally mistaken. It is TD Bank who insists that, because the manuscript is a work for hire, "TD Bank [as Commerce Bank's successor] is the work's statutory 'author' and sole copyright owner on day one and no transfer to TD Bank is required." (Appellee's Brief at 37 (citation omitted).) Where a work is made for hire, "the employer . . . is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all the rights comprised in the copyright." § 201(b). In contrast, a transfer or assignment implicates "the conveyance" (as § 204(a) puts it) of the owner's interest to another. A "work for hire" characterization thereby indicates that the employer has

11

been the exclusive copyright owner from the very beginning. Nimmer does state that an agreement whereby works prepared by the employee but not prepared within the scope of employment are deemed to be works made for hire "may be regarded as the equivalent of a simple transfer of copyright from the employee to the employer." 1 Nimmer on Copyright § 5.03[B][1][b][ii]. But the treatise does not provide any further explanation, and it immediately qualifies the statement itself by pointing to additional differences between a transfer and a work for hire, id. ("but will not trigger the various other legal consequences that flow from the status of a 'for hire' work" (footnote omitted)). (See, e.g., Majority Opinion at 20-21 & n.7 (pointing out that work's status determines duration of copyright, author retains certain non-waivable rights to cancel transfer after 35-40 years and perhaps waivable moral rights in proper attribution, and creator of work for hire lacks such rights).) In any event, the specific letter at issue here still fails to manifest "an unmistakable intent to effect a present transfer" of Hill's copyright interest (id. at 24).

For the foregoing reasons, I would vacate the District Court's summary judgment disposition on the question of copyright ownership and remand for further proceedings.